No. 25-227
_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

UPM TECHNOLOGY, INC.

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION *and*
UNITED STATES OF AMERICA,

*Respondents,*

UNIGESTION HOLDING, S.A. D/B/A DIGICEL HAITI,

*Intervenor*

_____

Petition for Review of Orders of
The Federal Communications Commission
Proceeding No. 23-64, Enforcement Bureau ID No. EB-23-MD-001
FCC 24-33 and FCC 24-131
_____

## PETITIONER UPM TECHNOLOGY, INC.'S OPENING BRIEF
_____

David M. Gossett
Christopher W. Savage
Katherine D. Sheriff
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
chrissavage@dwt.com
katherinesheriff@dwt.com

*Attorneys for Petitioner UPM Technology, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner UPM Technology, Inc. states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ....................................................................... v

JURISDICTIONAL STATEMENT ............................................................. 1

STATUTORY AUTHORITIES .................................................................. 1

STATEMENT OF ISSUES ........................................................................ 1

STATEMENT OF THE CASE .................................................................... 2

    A.    Regulatory Background ................................................... 3

    B.    Factual Background ........................................................ 8

        1.    Digicel's business in the United States ...................... 8

        2.    Purchasing and using Digicel's services ................... 9

        3.    UPM's resale of Digicel roaming service ................ 11

        4.    Digicel's termination of UPM's services to prevent UPM from reselling them ........................ 14

    C.    Procedural Background .................................................. 15

        1.    Proceedings in the District Court ............................ 15

        2.    Proceedings at the FCC .......................................... 17

SUMMARY OF ARGUMENT .................................................................. 18

STANDARD OF REVIEW ....................................................................... 21

ARGUMENT ........................................................................................... 22

I.    The FCC Erred In Concluding that Digicel Was Not A Telecommunications Carrier Subject To The Act .......................... 22

    A.    Digicel is a telecommunications carrier because it provides telecommunications to the public for a fee. ........................ 22

B.     The FCC's arguments to the contrary are makeweight.......................24

    1.    Digicel's roaming arrangements make it a carrier even though it has no facilities in the United States. ........................................................................24

        a.    Resellers are carriers even if they lack any facilities..........................................................25

        b.    Roaming is a form of resale...........................28

    2.    The details of Digicel's contractual offers are irrelevant to its status as a carrier.............................32

    3.    Digicel is a carrier even under the FCC's "location of offer" theory..........................................................34

II.    The FCC Erred In Concluding That Digicel Did Not Violate The Act By Cutting Off UPM's Services. ....................................................40

    A.    The FCC misconstrued the "just and reasonable" standard of Sections 201(b) and 202(a). ................................................40

        1.    The purpose of Sections 201(b) and 202(a) is to protect consumers from carrier market power and thus to promote competition. ....................................41

        2.    FCC precedent shows that resale restrictions are unjust, unreasonable, and unreasonably discriminatory because they permit carriers to maintain and enhance market power. ........................43

        3.    The exceptional situations where some resale restrictions are permitted confirm that Digicel's actions were unjust and unreasonable........................47

    B.    The FCC's justifications for Digicel's actions are unsupportable. ........................................................51

        1.    The jury verdict does not support the FCC's rulings...........................................................................53

2.      The Haitian government's policies on resale have no bearing on the lawfulness of Digicel cutting off UPM's services. ........................................................55

3.      The fact that resale caused Digicel's host carriers to demand and receive price reductions shows that those restrictions were anticompetitive and contrary to the Act....................................................56

CONCLUSION.....................................................................57

CIRCUIT RULE 28-2.6 STATEMENT OF RELATED CASES ...........................58

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ..............................59

CERTIFICATE OF SERVICE ................................................60

STATUTORY ADDENDUM ..................................................61

A.      5 U.S.C. § 706. Scope of review ......................................62

B.      47 U.S.C. § 152. Application of Act ..................................63

C.      47 U.S.C. § 153. Definitions .........................................64

D.      47 U.S.C. § 201. Service and charges ................................65

E.      47 U.S.C. § 202. Discriminations and preferences ...........................66

F.      47 U.S.C. § 251. Interconnection .....................................67

G.      47 U.S.C. § 332. Mobile services.....................................68

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All Am. Tel. Co., Inc. v. Fed. Commc'ns Comm'n,*
  867 F.3d 81 (D.C. Cir. 2017)........................................................................35, 53

*Chaffin v. Atlanta Coca Cola Bottling Co.,*
  194 S.E.2d 513 (Ga. Ct. App. 1972)..............................................................38

*City of Canby v. Rinkes,*
  136 Or. App. 602, 902 P.2d 605 (1995) ........................................................35

*Eagleview Techs. V. MDS Assocs.,*
  190 F.3d 1195 (11th Cir. 1999) .....................................................................34

*Fed. Trade Comm'n v. AT&T Mobility, LLC,*
  883 F.3d 848 (9th Cir. 2018) ......................................................19, 23, 24, 34

*FTC v. Verity Int'l, Ltd.,*
  194 F. Supp. 2d 270 (S.D.N.Y. 2002) ...........................................................25

*FTC v. Verity Int'l, Ltd.,*
  443 F.3d 48 (2d Cir. 2006) ............................................................................34

*In re United States for an Order Authorizing Roving
  Interception of Oral Commc'ns,*
  349 F.3d 1132 (9th Cir. 2003) .......................................................................26

*Lachs v. Fid. & Cas. Co. of N.Y.,*
  306 N.Y. 357, 118 N.E. 555 (1954)...............................................................39

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC,*
  533 F.2d 601 (D.C. Cir. 1976)........................................................................34

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005)................................................................................19, 26

*Real Est. Loan Fund Oreg. Ltd. v. Hevner,*
  76 Or. App. 349, 709 P.2d 727 (1985) ..........................................................35

*Slater v. Fid. & Cas. Co. of N.Y.*,
 98 N.Y.S.2d 28 (N.Y. App. Div. 1950) ................................................................38

*Steven v. Fid. & Cas. Co. of N.Y.*,
 377 P.2d 284 (Cal. 1962) ..................................................................................38

*Ting v. AT&T*,
 319 F.3d 1126 (9th Cir. 2003) ..........................................................4, 21, 33, 41, 53

*United States v. Unipoint Techs., Inc.*,
 159 F. Supp. 3d 262 (D. Mass. 2016) ..................................................................25

*Thornton v. Shoe Lane Parking, Ltd.*, 2 QB 163 (1971) ..........................................38

**Statutes**

Communications Act of 1934, *as amended*,
 47 U.S.C. § 151 *et seq.* .............................................................................*passim*

 § 152(a) ...............................................................................................4, 29, 63

 § 151(21) .............................................................................................3, 29, 64

 § 151(28) ..................................................................................................3

 § 151(50) ...................................................................................1, 3, 19, 23, 64

 § 151(51) ...........................................................................................*passim*

 § 151(53) ............................................................................1, 3, 19, 23, 26, 64

 § 201(b) .............................................................................................*passim*

 § 202(a) .............................................................................................*passim*

 § 208.......................................................................................................1, 17

 § 251(c)(4) ................................................................................................47, 50

 § 332(c)(A)(1)..............................................................................................5

Telecommunications Act of 1996, Pub. L. No. 104-104
 110 Stat. 56, *codified as amended at* 47 U.S.C. § 151 *et. seq.* ..........................25

5 U.S.C. § 706 ................................................................................................21, 62

**Administrative Materials**

*1998 Biennial Regulatory Review; Reform of
the International Settlements Policy and Associated
Filing Requirements*, Report and Order and Order on
Reconsideration, 14 FCC Rcd. 7963 (1999)......................................................7, 8

*Accelerating Wireline Broadband Deployment by Removing Barriers to
Infrastructure Investment*, Report and Order, Declaratory Ruling, and
Further Notice of Proposed Rulemaking, 32 FCC Rcd. 11128 (2017)..............35

*Amendment of Parts 1 and 63 of the Commission's Rules*,
Report and Order, 22 FCC Rcd. 11398 (2007)......................................29, 30, 31

*An Inquiry Into the Use of the Bands 825-845 MHz and
870-890 MHz for Cellular Communications Systems; and
Amendment of Parts 2 and 22 of the Commission's Rules
Relative to Cellular Communications Systems*, Report and
Order, 86 F.C.C.2d 469 (1981).........................................................................45

*Enforcement of Other Nations' Prohibitions Against
the Uncompleted Call Signaling Configuration of
International Call-back Service*, Order,
18 FCC Rcd. 6077 (2003).................................................................................56

*Implementation of the Local Competition Provisions
in the Telecommunications Act of 1996*, First Report
and Order, 11 FCC Rcd. 15499 (1996)..............................................................50

*Implementation of Section 309(j) of the Communications
Act—Competitive Bidding*, Notice of Proposed Rulemaking,
8 FCC Rcd. 7635 (1993)...................................................................................47

*Interconnection and Resale Obligations Pertaining
to Commercial Mobile Radio Services, et al.*,
First Report and Order, 11 FCC Rcd. 18455 (1996).........................................48

*Interconnection and Resale Obligations Pertaining
    to Commercial Mobile Radio Services; Personal Communications
    Industry Association's Broadband Personal Communication Services
    Alliance's Petition for Forbearance for Broadband Personal
    Communication Services; Forbearance from Applying Provisions of the
    Communications Act to Wireless Telecommunications Carriers; Further
    Forbearance from Title II Regulation for Certain Types of Commercial
    Mobile Radio Services,*
    Memorandum Opinion and Order on Reconsideration,
    14 FCC Rcd. 16340 (1999)................................................................49

*International Settlement Rates,* Report and Order,
    12 FCC Rcd. 19806 (1997)............................................................7, 8

*Policy and Rules Concerning the Interstate, Interexchange
    Marketplace; Implementation of Section 254(g) of the
    Communications Act of 1934, as amended,* Order on Reconsideration,
    12 FCC Rcd. 15014 (1997), *recons. granted in part by Policy and Rules
    Concerning the Interstate, Interexchange Marketplace,* 14 FCC Rcd.
    6004 (1999)....................................................................................33

*Personal Communications Industry Association's Broadband
    Personal Communications Services Alliance's Petition for
    Forbearance for Broadband Personal Communications Services,*
    Memorandum Opinion and Order and Notice of Proposed Rulemaking,
    13 FCC Rcd. 16857 (1998)........................................................41, 42

*Protecting and Promoting the Open Internet,* Report
    and Order On Remand, Declaratory Ruling, and Order,
    30 FCC Rcd. 5601 (2015), *aff'd, United States Telecom
    Ass'n v. Fed. Commc'ns Comm'n,* 825 F.3d 674 (D.C. Cir. 2016),
    *abrogated on other grounds by Restoring Internet Freedom,* 33 FCC
    Rcd. 311 (2018), *vacated in part on other grounds by Mozilla Corp. v.
    Fed. Commc'ns Comm'n,* 940 F.3d 1 (D.C. Cir. 2019).....................25

*Reexamination of Roaming Obligations of Commercial Mobile Radio
    Service Providers,* Report and Order and Further Notice of Proposed
    Rulemaking, 22 FCC Rcd. 15817 (2007) ......................................6, 9

*Regulation of International Accounting Rates,*
    First Report and Order, 7 FCC Rcd. 559 (1991) ..............................46

viii

*Regulatory Policies Concerning Resale and Shared
    Use of Common Carrier Domestic Public Switched
    Network Services*, Report and Order, 83 F.C.C.2d 167
    (1980), *aff'd, Nat'l Ass'n of Regul. Util. Comm'rs
    v. FCC*, 746 F.2d 1492 (D.C. Cir. 1984) ..........................................................44

*Regulatory Policies Concerning Resale and Shared Use of Common
    Carrier Services and Facilities*, Report and Order, 60 F.C.C.2d 261
    (1976), *amended by*, 62 F.C.C.2d 588 (1977), *aff'd,
    Am. Tel. &Tel. Co. v. FCC*, 572 F.2d 17 (2d Cir. 1978) ............................*passim*

*Request for Review and/or Waiver of a Decision of the Universal
    Service Administrator by Park Hill School District Kansas City,
    Missouri; Schools and Libraries Universal Service Support Mechanism*,
    Order, 35 FCC Rcd. 4427 (2020). ....................................................................25

## Other Authorities

RESTATEMENT (SECOND) OF CONTRACTS (1981) ......................................................35

Jonathan G. Rohr, *Smart Contracts and Traditional Contract Law, or: The
    Law of the Vending Machine*, 67 Clev. St. L. Rev. 71 (2019) ...........................38

R. Welch, *Demystifying Primary Jurisdiction Referrals*,
    https://www.fcc.gov/news-events/blog/2010/07/29/demystifying-
    primary-jurisdiction-referrals.............................................................................17

1 WILLISTON ON CONTRACTS (4th ed. 1999) .........................................................35

## JURISDICTIONAL STATEMENT

This petition seeks review of two orders of the Federal Communications Commission (FCC) denying a complaint UPM Technology, Inc. (UPM) filed under 47 U.S.C. § 208. The FCC issued the Memorandum Opinion and Order denying UPM's complaint on March 19, 2024. 1-ER-17–37; 39 FCC Rcd. 3655 (2024) (*Order*). It issued the Order on Reconsideration on December 11, 2024. 1-ER-2–16; FCC 24-131 (Dec. 11, 2024) (*Reconsideration*).

These orders are reviewable in this Court under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). UPM timely filed its petition for review on January 13, 2025, within the 60-day period established by 28 U.S.C. § 2344. Venue is proper in this Court under 28 U.S.C. § 2343 because UPM's principal places of business are in Oregon and California.

## STATUTORY AUTHORITIES

An addendum containing pertinent statutes is attached to this brief.

## STATEMENT OF ISSUES

1.      Whether the FCC erred in holding that Intervenor Unigestion Holding, S.A. d/b/a Digicel Haiti (Digicel) was not a "telecommunications carrier" within the meaning of the Communications Act of 1934 (the Act), 47 U.S.C. §§ 153(50), (51), (53), when Digicel purchased telecommunications services from facilities-based United States carriers and resold those services to users within the United States.

2.      Whether the FCC erred in holding that it was reasonable and non-

1

discriminatory under 47 U.S.C. §§ 201(b) and 202(a) for Digicel to cut off UPM's services because UPM was reselling those services rather than using them itself.

## STATEMENT OF THE CASE

This case involves efforts by Digicel to maintain its monopoly control over the pricing of calls from the United States to its network in Haiti—where it is an effective monopolist, controlling 70% or more of the total telephone market.[1] Digicel had set up a discriminatory pricing scheme under which most traffic to its network in Haiti followed a route on which Digicel charged $0.23 per minute, but for other traffic, using another route, Digicel only charged $0.09 per minute. UPM purchased service from Digicel at the $0.09 per minute rate and resold it to customers who would otherwise have paid the $0.23 per minute rate. When Digicel saw what UPM was doing, it cut off UPM's service.

Among the benefits of resale is that it undercuts price discrimination schemes. As a result, Digicel's efforts to prevent UPM from reselling Digicel's services violated longstanding FCC holdings that restrictions on resale are unjust, unreasonable, and unreasonably discriminatory. When UPM presented the FCC with Digicel's unlawful ban on resale, however, the agency condemned ***UPM's resale*** as

---

[1] 2-ER-202 ¶ 18 (*UPM Complaint*) (alleging 70% market share); 2-ER-180 (*Digicel Answer*) (admitting market share).

unreasonable and upheld Digicel's cutting UPM off as permissible behavior. UPM seeks reversal of these erroneous rulings.

### A.    Regulatory Background

To understand this dispute, it is important to comprehend several aspects of how wireless telecommunications services are provided and regulated.

***Telecommunications services.*** Under the Act, "telecommunications" is the transmission of information from one place to another, and "telecommunications service" is selling telecommunications.[2] Although what qualifies as a telecommunications service can be complicated—for example, the decades-long dispute over whether broadband internet access service is a telecommunications service—this case involves wireless voice telephone calls, which indisputably are generally a telecommunications service.

Companies that provide telecommunications service are called "carriers."[3] If a carrier provides service that crosses state lines or connects to another country, those services are "interstate communication[s]"[4] or "foreign communication[s],"[5] and the

---

[2] 47 U.S.C. §§ 153(50), (53).

[3] 47 U.S.C. § 153(51).

[4] 47 U.S.C. § 153(28).

[5] 47 U.S.C. § 153(21).

3

carrier is regulated by the FCC under the Act.[6] This dispute involves foreign communications—telephone calls from the United States to Haiti.

One of carriers' key regulatory obligations is to provide service on terms that are "just and reasonable" (Section 201(b)) and not "unreasonab[ly] discriminat[ory]" (Section 202(a)).[7] In the past, the FCC enforced these standards by reviewing and, if necessary, modifying detailed written tariffs that the carriers were required to file with the agency. Today, most telephone services are offered in the market without the obligation to file tariffs. Even so, carrier services, and the terms on which they are provided, remain subject to the obligations of Sections 201(b) and 202(a), and the FCC has regulatory authority over those services.[8]

***Wireless services.*** Wireless services are telecommunications services where the connection from a customer's telephone (called a "handset" in the wireless context) to the carrier's network is made by radio waves ("spectrum") instead of copper wires or fiber optic cable. Companies that provide wireless services are

---

[6] 47 U.S.C. § 152(a).

[7] Unless otherwise noted, all references to statutory "Sections" refer to provisions of 47 U.S.C.

[8] *See*, *e.g.*, *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) (while Sections 201(b) and 202(a) continue to apply to detariffed long distance services, they do not conflict with, and therefore do not preempt, state consumer protection law).

carriers and are subject to the obligations of Sections 201(a) and 202(b).[9] The FCC controls the use of spectrum in the United States under Title III of the Act, 47 U.S.C. § 301 *et seq*. So, to build a wireless network, a carrier needs a spectrum license from the FCC. But no license or spectrum is required to resell wireless services.

**Resale.** In the telecommunications industry, resale is "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public (with or without 'adding value') for profit."[10] Resellers do not have a physical network of their own, but instead buy services provided by other carriers, and then sell those services to third parties—either to end users or to other carriers. Resellers are carriers under the Act (sometimes called "non-facilities-based carriers") and are subject to the same obligations under Sections 201(b) and 202(a) as any other carriers.[11] The FCC has held, in a wide range of contexts, that it is unjust, unreasonable, and unreasonably discriminatory for carriers to refuse to sell their services to resellers.[12]

---

[9] *See* 47 U.S.C. § 332(c)(1)(A) (commercial mobile service providers treated as carriers; FCC may not exempt them from Sections 201 and 202).

[10] *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities*, Report and Order, 60 F.C.C.2d 261, ¶ 17 (1976) (*Resale Order*), *amended by* 62 F.C.C.2d 588 (1977), *aff'd sub nom*, *AT&T Co. v. FCC*, 572 F.2d 17 (2d Cir. 1978).

[11] *Resale Order* at ¶¶ 8, 101.

[12] *See* Part II.A.2, *infra*.

***Roaming.*** Roaming is an arrangement between two facilities-based wireless carriers that allows customers of one carrier (called the "home carrier") to obtain service on the network of another carrier (called the "host carrier"). The home carrier enters into an agreement with the host carrier so that, when the home carrier's customers are outside the area served by the home carrier's network but in an area served by the host carrier's network, those customers can make and receive calls. Roaming does not involve a business arrangement or establish a contract between the customer and host carrier; instead, the contract is between the two carriers. The host carrier bills the home carrier for the calls that a customer makes at rates the two carriers agree upon, and the home carrier then bills its customer for those calls based on the rates set by its contract with that customer.[13] In this way, roaming is a form of resale (with the home carrier reselling the services of the host carrier).

***Prepaid v. Post-Paid Services.*** Wireless carriers can sell their services on a "prepaid" or "post-paid" basis. With prepaid service, customers pay the carrier in advance—usually a dollar amount to be debited as the customer uses the carrier's services—and are only permitted to make calls when there is enough money in their accounts. With post-paid service, the customer typically signs up for a recurring

---

[13] *See Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd. 15817, ¶¶ 5-6 (2007) (*Roaming Reexamination Order*).

month-to-month contract to use the wireless service—sometimes with a specified minimum term or an early termination fee—and then receives a monthly bill for service that the customer pays after the fact. With prepaid services, the carrier is completely assured of getting paid for the services it provides. With post-paid services, the carrier takes the risk that a customer will use service but then not pay for it. The services at issue in this case are Digicel's pre-paid services.[14]

*International calling.* To complete a call from the United States to another country, the call must be handed off to the carrier in the other country that serves the party being called. The process of completing the call is called "terminating" the call. Carriers traditionally charge a fee for terminating incoming international calls. In 1997 and 1999, in order to deal with a longstanding practice of carriers in foreign countries charging very high rates for terminating calls from the United States, the FCC set maximum rates—called "benchmark" rates—that United States carriers are permitted to pay foreign carriers for call termination.[15] These benchmark rates, although lower than the rates previously charged by many foreign carriers, were still

---

[14] 2-ER-95 (*Joint Statement*) ¶ 8 (this document includes facts not in dispute before the FCC); *see also* 3-ER-368–369 (Deposition of Maarten Boute) (*Boute Deposition*) at 25:10-26:11. (Mr. Boute was Digicel's CEO.)

[15] *See International Settlement Rates*, Report and Order, 12 FCC Rcd. 19806 (1997) (*Benchmark Order*); *1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements*, Report and Order and Order on Reconsideration, 14 FCC Rcd. 7963 (1999) (*Settlements Reform Order*).

much higher than the actual cost the foreign carriers incur in terminating calls.[16] When the FCC established the benchmark rates, the agency stated that it would rely on the development of new technology and market competition to drive call termination rates down closer to cost over time.[17]

### B. Factual Background

#### 1. Digicel's business in the United States

Digicel is the largest telephone carrier in Haiti, where it controls at least 70% of all telephone service, including mobile (wireless) and landline services.[18] Digicel has no wireless facilities in the United States. However, it has entered into roaming agreements with AT&T and T-Mobile, so customers that subscribe to Digicel's wireless service can make calls here. This includes the ability to make calls from the United States to Haiti.[19] In other words, Digicel was a reseller of AT&T's and T-Mobile's wireless services. It "subscribe[d] to the communications services [of its host carriers] and then reoffer[ed them] … to the public … for profit."[20] As in any resale arrangement, Digicel's host carriers did not charge Digicel's customers and

---

[16] *Benchmark Order* at ¶¶ 2, 40 & n.50; *Settlements Reform Order* at ¶¶ 34, 70, 91.

[17] *Settlements Reform Order* at ¶¶ 1, 63 n.119.

[18] *UPM Complaint* ¶ 18, 2-ER-202; *Digicel Answer*, 2-ER-180.

[19] *See generally* 2-ER-238–278 (Opinion and Order, *Unigestion Holding, S.A. v. UPM Tech., Inc., et al.*, No. 3:15-CV-00185-SI (D. Or. Jan. 18, 2022)) (*Summary Judgment Ruling*); 2-ER-265; *see also Reconsideration* ¶¶ 6-7, 1-ER-4–5.

[20] *Resale Order* at ¶ 17.

had no business relationship with them.[21] Instead, Digicel paid the host carriers for calls its customers made,[22] and charged its own customers its own rates for the calls.

At the times relevant to this dispute, Digicel offered two primary pricing arrangements for roaming in the United States. First, by default, its users would pay a very high per-minute rate. Alternatively, Digicel offered a pricing plan called "Roam Like You're Home," or "RLYH." Under RLYH, a customer in the United States paid Digicel an enrollment fee of about $25, after which, for 30 days, the customer could call Haiti from the United States for about $0.09 per minute.[23]

### 2. Purchasing and using Digicel's services

To use the services of a wireless carrier like Digicel, a subscriber must possess a SIM card compatible with the carrier's network. At the times relevant to this dispute, a SIM card was a small computer chip that contained identifying information used to authenticate the subscriber on the carrier's network.[24] A SIM card plays no role in transmitting, switching, or routing calls; rather, it is analogous to the driver's license presented by a restaurant patron ordering a glass of wine. The

---

[21] *See Roaming Reexamination Order* at ¶¶ 5-6 (distinguishing "manual" roaming, in which a customer must manually establish a business relationship with the host carrier, from automatic roaming, where the arrangement is between the home carrier and host carrier).

[22] *See id*.

[23] *Joint Statement* ¶¶ 15, 16(g), 2-ER-97–98.

[24] *Joint Statement* ¶¶ 5-6, 2-ER-95.

driver's license contains information that shows that the patron is over 21, and so can buy wine, but once the patron is identified as old enough, the license is not involved in pouring the wine, drinking it, or paying for it. Similarly, the information on the SIM card is transmitted to the wireless network before a call is made and shows that the caller has a valid account and so can buy phone calls. But the SIM card itself is not involved in transmitting, switching, or paying for those calls.[25]

Unlike most wireless carriers based in the United States, Digicel did not sell SIM cards for its network directly to the public.[26] Instead, Digicel sold SIM cards to thousands of third-party distributors in Haiti.[27] These third-party distributors then sold the SIM cards on the open market to anyone who would buy them.[28] Digicel generally did not know who bought SIM cards or who used them.[29] And, because

---

[25] *Joint Statement* ¶¶ 5-8, 13, 2-ER-95–96. Because SIM cards simply provide authentication information rather than performing any physical call transmission functions, many modern handsets use entirely virtual "SIM cards," called "eSIMs," either in addition to or in place of old-style physical SIM cards. These virtual SIMs are not relevant to this dispute (and in any event do not affect the analysis here).

[26] *Joint Statement* ¶ 17, 2-ER-98.

[27] 2-ER-80 (Transcript of Trial at 123:4-13) (*Trial Transcript*). The relevant pleadings and materials from the district court proceeding—which we cite in this brief—were all filed with the FCC in the complaint proceeding.

[28] *Joint Statement* ¶ 6, 2-ER-95.

[29] *Summary Judgment Ruling*, 2-ER-266–267 & n.17; *see also Boute Deposition* at 36:23-37:6, 3-ER-370–371.

Digicel's services were largely prepaid rather than postpaid, Digicel did not need to know who its customers were; it only needed the customers to prepay for service.

There were no written terms or conditions associated with distributors' sale of SIM cards,[30] and customers did not sign any written agreement when buying them. Moreover, at no point in the process of activating a SIM card or using Digicel's service was UPM (or any other Digicel customer in the United States) required to click "I agree" or otherwise review or accept any terms or conditions associated with Digicel's service.[31] Digicel's services were thus available to anyone with a compatible SIM card, without restriction, and without any conditions on how the purchaser could use their prepaid service. If a customer had prepaid service on an active SIM card, Digicel would transmit the call.

### 3. UPM's resale of Digicel roaming service

UPM is a United States corporation, based in Oregon and California, that at the times relevant to this litigation operated primarily as a reseller in the wholesale market for international call termination services. In 2014, UPM saw an opportunity to use Digicel's RLYH service to offer call termination to Haiti at lower rates than

---

[30] *Summary Judgment Ruling*, 2-ER-253–254 & n.11.

[31] *Id.*

11

the $0.23 per minute rate that Digicel directly offered to U.S. carriers.[32]

UPM hired agents in Haiti to buy SIM cards for Digicel's network and ship them to UPM in Oregon. As noted, Digicel SIM cards are sold by third-party distributors, not directly by Digicel—and thus UPM's agents purchased those SIM cards from these distributors. Once UPM had these SIM cards, it purchased Digicel's prepaid wireless services in Oregon using Digicel's standard automatic process.[33] This process began with Digicel making an express offer to buy the RLYH plan, sent by text message to UPM.[34] What followed was an exchange of electronic text messages between UPM and Digicel's system.[35] It did not entail any human-to-human communication between Digicel and the customer, and did not permit

---

[32] Prior to reselling the Digicel United States services at issue here, UPM had used a different technical configuration to sell calls terminating in Haiti. In this other configuration, when a UPM customer had a call bound for Haiti, UPM would transmit the call to Haiti via the internet and then, using equipment UPM had placed in Haiti, convert the call to a wireless call there. *Summary Judgment Ruling*, 2-ER-252-255. This earlier form of resale is not at issue in this case. For a fuller description of UPM's business model and the underlying dispute between Digicel and UPM, *see* 2-ER-279–291 (Declaration of Bruce Tran as Chief Executive Officer of UPM Technology, Inc. in Support of UPM Technology, Inc.'s Motion for Summary Judgment, *Unigestion Holding, S.A. v. UPM Tech., Inc., et al.*, Or. D. No. 3:15-CV-00185-SI (Nov. 12, 2021)) (*Tran Declaration*); 2-ER-294–309 (Counterclaim Plaintiff's Lay Witness Statements, *Unigestion Holding, S.A. v. UPM Tech., Inc., et al.*, Or. D. No. 3:15-CV-00185-SI (Sep. 30, 2022)) (*UPM Witness Statements*).

[33] *Joint Statement* ¶ 16, 2-ER-95–96; *Tran Declaration* ¶¶ 25-27, 2-ER-286.

[34] *Joint Statement* ¶ 16, 2-ER-97–98.

[35] *Id.*

negotiation regarding the service or its pricing.[36] UPM did not require or seek any special ordering or billing arrangements from Digicel, and did not require or seek any special prices. UPM simply purchased Digicel's service on the same terms, using the same ordering processes, and at the same prices, at which Digicel made those services available to anyone with a Digicel SIM card in the United States.

The services UPM purchased were all prepaid services.[37] Accordingly, Digicel's system would only permit UPM to make calls if UPM had already paid Digicel. UPM pre-paid Digicel using online "top-up" or "recharge" sites to add funds to the accounts of its SIM cards.[38] When UPM made a call, Digicel deducted its per-minute retail rate in real time.[39] Digicel thus received its retail rate for every call UPM made.[40]

UPM did not use the services it bought from Digicel for itself. Instead, it resold those services to its own wholesale customers.[41] UPM's customers were third-

---

[36] *Summary Judgment Ruling*, 2-ER-255–256.

[37] *Joint Statement* ¶ 8, 2-ER–95.

[38] *Summary Judgment Ruling*, 2-ER-251-252, 255–256; *UPM Witness Statements*, 2-ER-305–306.

[39] *Joint Statement* ¶ 8, 2-ER-95.

[40] *See id.*; *see also Summary Judgment Ruling*, 2-ER-265; *Boute Deposition*, 3-ER-376–380.

[41] *Tran Declaration* ¶ 4, 2-ER-281.

party carriers seeking competitive options for getting calls to end users in Haiti.[42] UPM's customer would transmit the telephone number in Haiti being called, and UPM would use the Digicel service it had purchased to call that number using the wireless networks of Digicel's host carriers. UPM's equipment then connected the incoming call from its carrier-customer to the outgoing wireless call it had just made to the Haitian end user.[43] Connecting these two calls created an end-to-end call from the original calling party in the United States to the called party in Haiti. In other words, UPM was a reseller—specifically, UPM resold Digicel's services to UPM's own customers.

### 4. Digicel's termination of UPM's services to prevent UPM from reselling them

Although purchasers of Digicel's SIM cards would never see anything to support this claim—since they never received any written terms or conditions— Digicel asserts that reselling its service was a form of "fraud," which it also called "bypass."[44] It used various technical means to identify when its customers were reselling the services they had bought.[45] When Digicel determined that a SIM card

---

[42] *Joint Statement* ¶¶ 12-13, 2-ER-96.

[43] *Id.*

[44] *Summary Judgment Ruling*, 2-ER-241–242; 3-ER-340–342, Opinion and Order on Motions in Limine and Other Objections, *Unigestion Holding, S.A. v. UPM Tech., Inc., et al.*, No. 3:15-CV-00185-SI (D. Or. Oct. 28, 2022) (*In Limine Ruling*).

[45] *Joint Statement* ¶¶ 18, 20, 2-ER-98.

was being used to authenticate resale calls, it cut off that SIM card so that the card could no longer be used. This had the purpose and effect of denying service to UPM.[46] If there was still money in an account when Digicel cut off a UPM SIM card, Digicel kept it.[47] The sole basis on which Digicel decided to cut off UPM's SIM cards was a determination that they were being used for resale.[48]

Digicel's efforts to identify and cut off services that UPM was reselling were effective, leading UPM to exit the market in late 2014.[49] At that time, UPM stopped buying and reselling Digicel's services.

### C.    Procedural Background

#### 1.    Proceedings in the District Court

Pursuing its view that the resale of its services is a form of fraud, in 2015 Digicel sued UPM and several individual UPM officers and employees in federal court in Oregon, alleging common law fraud and claims under the Racketeer Influenced Corrupt Organization Act (RICO). UPM denied liability on Digicel's claims and raised counterclaims under antitrust law, the Act, and various common law theories.

UPM claimed (a) that Digicel was a telecommunications carrier under the Act

---

[46] *Id.*

[47] *Joint Statement* ¶ 18, 2-ER-98.

[48] *Joint Statement* ¶¶ 18, 20-21, 2-ER-98; *UPM Complaint* ¶ 72, 2-ER-225.

[49] *Joint Statement* ¶ 21, 2-ER-98; *Order* ¶ 12, 1-ER-24–25.

by virtue of providing wireless service in the United States, and (b) that Digicel had violated Sections 201(b) and 202(a) by cutting off the services UPM was reselling. FCC precedent establishes that restrictions on resale are unjust, unreasonable and unreasonably discriminatory.[50]

The district court dismissed Digicel's RICO claims and UPM's antitrust claims. On cross-motions for summary judgment, the district court dismissed Digicel's claims against UPM's employees (but not against its CEO/owner) and ruled that resale of Digicel's services is not fraud.[51] But the court also ruled that, if UPM used certain software techniques to interfere with Digicel's ability to identify SIM cards being used for resale, that might constitute a form of "fraud by active concealment" under Oregon common law, and concluded that there was sufficient evidence on that claim to go to trial.[52]

As the case moved towards trial, Digicel asked the district court to refer UPM's Communications Act claims to the FCC under the doctrine of primary jurisdiction. The district court granted that motion and stayed proceedings on UPM's

---

[50] *See* Part II.A.2, *infra*.

[51] *See Summary Judgment Ruling*, 2-ER-238–278.

[52] *Summary Judgment Ruling*, 2-ER-268–269. It is unclear how it could be fraudulent for UPM to take steps to keep Digicel from cutting off its services when (a) reselling them was not fraudulent, (b) UPM had paid for them, and (c) there were no governing written terms and conditions addressing resale. UPM plans to raise this issue on appeal from the district court.

16

counterclaims against Digicel. It also granted Digicel's motion *in limine* barring UPM from discussing the Act or its policies—including the promotion of competition among carriers by means of resale.[53] At trial, the jury found that UPM was liable for fraud by active concealment—that is, that UPM had tried to prevent Digicel from identifying the SIM cards UPM was using. On post-trial motions, the district court ordered a reduction in damages but let the verdict stand.[54] The district court has not yet entered judgment on Digicel's fraud claim. Proceedings in the district court on UPM's counterclaims are stayed pending resolution of this petition for review of the FCC primary jurisdiction referral order.[55]

### 2. Proceedings at the FCC

Pursuant to the district court's primary jurisdiction referral and Section 208,[56] UPM filed a complaint against Digicel at the FCC, arguing that Digicel's provision

---

[53] *In Limine Ruling*, 3-ER-344–345, 348–49.

[54] *See Unigestion Holding, S.A. v. UPM Tech., Inc.*, No. 3:15-cv-185-SI, 2025 WL 33165, at *1–2 (D. Or. Jan. 6, 2025), *reconsid. denied*, 2025 WL 755959 (D. Or. Mar. 10, 2025).

[55] *See id*. UPM also has counterclaims against Digicel for breach of implied-in-fact contract, money had and received, conversion, unjust enrichment, and intentional interference with prospective economic advantage. *See* Answer, *Unigestion Holding, S.A. v. UPM Tech., Inc., et al.*, No. 3:15-CV-00185-SI (D. Or. Mar. 1, 2016), ECF 73 at 49-64.

[56] *See* Richard Welch, *Demystifying Primary Jurisdiction Referrals*, FCC Blog (July 29, 2010), https://www.fcc.gov/news-events/blog/2010/07/29/demystifying-primary-jurisdiction-referrals.

of services in the United States made it a telecommunications carrier subject to the Act and that cutting off UPM's services because UPM was reselling them violated Sections 201(b) and 202(a).[57]

The FCC ruled that Digicel was not a carrier, principally on the theory that Digicel's contractual "offer" to provide service was not made in the United States, but was instead made when Digicel sold SIM cards to distributors in Haiti.[58] The FCC also relied on the facts that (a) Digicel's principal business is as a foreign carrier in Haiti, and (b) Digicel did not have physical network facilities in the United States. In the alternative, the FCC ruled—relying on the jury verdict—that even if Digicel were a carrier, it was permissible for Digicel to cut off UPM's services, principally because the FCC characterized that action as an effort to prevent fraudulent use of Digicel's services.[59]

UPM sought reconsideration, which the FCC denied.[60] UPM's petition to this Court followed.

## SUMMARY OF ARGUMENT

**I**. The FCC erred in concluding that Digicel was not a carrier. A

---

[57] *See UPM Complaint*, *passim*, 2-ER-189–237.

[58] *Order* ¶¶ 20-24 & n.105, ¶ 27, 1-ER-27–32; *Reconsideration* ¶ 17, 1-ER-11–12.

[59] *Order* ¶¶ 30, 33 & nn.136-137, ¶ 36 & n.145, 1-ER-32–33, 35–37; *Reconsideration* ¶¶ 20-22 & nn.96 & 98, 1-ER-13–15.

[60] *UPM Reconsideration Petition*, 2-ER-39–67; *Reconsideration*, 1-ER-2–16.

"telecommunications carrier" is an entity that provides telecommunications (telephone calls) to the public for money.[61] An entity is a carrier based on the services it provides.[62] Digicel sold calls in the United States to anyone who had a compatible SIM card. This means that it was a carrier with respect to those activities.

A reseller is an entity that buys a carrier's services and then resells those services to others, and resellers are themselves carriers.[63] The Act "do[es] not distinguish facilities-based and non-facilities-based carriers," that is, between facilities-based carriers and resellers.[64] Digicel bought service from host carriers and then resold that service to its customers. That means that Digicel was a reseller and a carrier.

The FCC's conclusion to the contrary is plainly wrong. The agency first erred by holding that an entity's status as a carrier depends on where it makes its offer to provide service.[65] There is no basis for that conclusion; rather, determination of carrier status is based on the services provided.[66] But this holding is wrong even

---

[61] 47 U.S.C. §§ 153(50), (51), (53).

[62] *Fed. Trade Comm'n v. AT&T Mobility, LLC*, 883 F.3d 848, 850, 858-64 (9th Cir. 2018).

[63] *Resale Order* at ¶¶ 8, 17, 101, 130; 47 U.S.C. §§ 153(51), (53).

[64] *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 997 (2005).

[65] *Order* ¶¶ 18-21, 27, 1-ER-27–28, 31; *Reconsideration* ¶¶ 10, 14, 17, 1-ER 6, 10, 11–12.

[66] *AT&T Mobility*, 883 F.3d 848.

applying the FCC's erroneous theory. The FCC held that Digicel's offer to provide calls from the United States to Haiti occurred when it sold SIM cards to third-party distributors in Haiti. The terms of a contractual offer, however, are determined by an objective assessment of the offeror's actions. Here, the *relevant* offer—of the RLYH pricing plan for calls from the United States to Haiti—occurred in the United States.

For starters, no reasonable person could interpret Digicel's sale of SIM cards to distributors as an offer to provide services to the then-unknown third parties who would eventually obtain and use them. By contrast, Digicel directly offered its services to UPM and other customers in the United States. Whenever a SIM card was first used to authenticate a call in the United States, Digicel sent a text message inviting the SIM card holder to subscribe to the RLYH plan—an express offer.[67] Also, a SIM card holder in the United States could subscribe to RLYH at any time by sending a text message to Digicel's system.[68] This configuration created an implied-in-fact offer, akin to a vending machine offering snacks by virtue of its physical set-up. So, Digicel "offered" its services in the United States, and is a carrier even under the FCC's theory.

**II.** The FCC's alternative holding—that even if Digicel were a carrier, it did

---

[67] *Joint Statement* ¶ 16, 2-ER-97–98.

[68] *Id.*

20

not violate Sections 201(b) and 202(a) in cutting off UPM's services—is equally flawed. The Act forbids "unjust or unreasonable" practices and "unreasonable" discrimination.[69] The purpose of the Act is to promote competition in all telecommunications markets,[70] and the purpose of Sections 201(b) and 202(a) is to protect customers from anticompetitive practices. FCC precedent holds that bans on resale are unjust and unreasonable because they are anticompetitive.[71]

Here, the FCC not only failed to apply this precedent to condemn Digicel's ban on resale; it instead attacked UPM's resale activities, holding (based on a misunderstanding of Oregon tort law) that they were a form of fraud and that the beneficial effect of UPM's resale—forcing Digicel to lower its prices—was a reason to uphold Digicel's actions. That ruling is inconsistent with the Act and must be vacated.

## STANDARD OF REVIEW

This Court reviews FCC orders under the Administrative Procedure Act, 5 U.S.C. § 706. Under that statute, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[69] 47 U.S.C. §§ 201(b), 202(a).

[70] *Ting*, 319 F.3d at 1132.

[71] *See* Part II.A.2, *infra*.

## ARGUMENT

The FCC rejected UPM's complaint on two grounds—that Digicel "did not offer a common carrier or telecommunications service in the United States and thus is not subject to [the Act] or the Commission's jurisdiction,"[72] and in the alternative that "even assuming jurisdiction exists, UPM's claims" under the Act "lack merit."[73] Neither holding is defensible, and thus this Court should grant the petition for review.

## I. The FCC Erred In Concluding that Digicel Was Not A Telecommunications Carrier Subject To The Act.

### A. Digicel is a telecommunications carrier because it provides telecommunications to the public for a fee.

The FCC's primary reason for rejecting UPM's complaint was to deny that Digicel is a "telecommunications carrier," and thus deny that the Commission had jurisdiction over Digicel. Respectfully, this holding is gobbledygook, and should not have survived review even under a deferential *Chevron*-type analysis. The fact that Digicel is a telecommunications carrier subject to the FCC's jurisdiction under the Act is plain from the face of the statute.

Under the Act, "'telecommunications' means the transmission, between or

---

[72] *Order* ¶ 2, 1-ER-17; *see also Reconsideration* ¶ 9, 1-ER-5–6.

[73] *Order* ¶ 2, 1-ER-17; *see also Reconsideration* ¶ 20, 1-ER-13–14.

among points specified by the user, of information of the user's choosing."[74] There is no dispute that this includes wireless phone calls, the service at issue here. A "'telecommunications carrier' means any provider of telecommunications services,"[75] which is in turn defined as "the offering of telecommunications for a fee directly to the public … regardless of the facilities used."[76] Given the derivative nature of the definition of "telecommunications carrier," the FCC's determination here necessarily turned on the definition of "telecommunications service."[77] And under that definition, whether an entity is a carrier depends on what its "offering" is—that is, what it provides.[78]

What Digicel "offers[s]" to customers in the United States is straightforward: It offers to sell them voice telephone calls from the United States to Haiti at a specific rate. There is no dispute that these telephone calls constitute "telecommunications" under the Act.[79] There is also no dispute that Digicel charges a fee for providing those calls.[80] And there is no dispute that Digicel would sell calls under the RLYH

---

[74] 47 U.S.C. § 153(50).

[75] 47 U.S.C. § 153(51).

[76] 47 U.S.C. § 153(53).

[77] *See, e.g.*, *Reconsideration* ¶ 10, 1-ER-6.

[78] *AT&T Mobility*, 883 F.3d 848.

[79] *See* 47 U.S.C. § 153(50).

[80] *Joint Statement* ¶ 15, 2-ER-97.

plan to anyone in the United States with a SIM card who paid the enrollment fee.[81] That is selling telecommunications. So Digicel is a carrier, and the FCC's holding to the contrary must be reversed.

### B. The FCC's arguments to the contrary are makeweight.

The FCC erroneously relied on the fact that Digicel's principal business is as a foreign wireless carrier in Haiti to conclude that it was not *also* a United States carrier.[82] But an entity's status as a carrier is not binary; it is determined separately for the different activities in which the entity is engaged because the Act requires the FCC to regulate an entity as a carrier "to the extent that it is engaged in providing telecommunications services."[83] Digicel's Haitian activities are irrelevant; what matters is what it did in the United States—which was selling phone calls.

#### 1. Digicel's roaming arrangements make it a carrier even though it has no facilities in the United States.

The agency explained its refusal to view Digicel as a telecommunications carrier in part on the ground that all Digicel did was sell to its customers the ability to "roam" on the wireless service provided by AT&T and T-Mobile—that is, to use those carriers' services in the United States.[84] But while the premise of that argument

---

[81] *Joint Statement* ¶ 16, 2-ER-97–98.

[82] *See Order* ¶¶ 3, 25, 1-ER-18, 30; *Reconsideration* ¶ 15, 1-ER-10–11.

[83] 47 U.S.C. § 153(51); *AT&T Mobility*, 883 F.3d 848.

[84] *See Order* ¶ 6, 1-ER-19–20.

is correct, the conclusion does not follow. By offering this service, Digicel was a reseller of those other carriers' telecommunications service, and thus itself qualifies as a telecommunications carrier under the Act.

### a. Resellers are carriers even if they lack any facilities.

A reseller is an entity that buys a carrier's services and then resells those services to others.[85] FCC precedent establishes that resellers are carriers even if they have no facilities of their own.[86] The FCC and the courts have consistently relied on this long-standing definition of resellers as carriers.[87]

In the Telecommunications Act of 1996,[88] which amended the Act, Congress embedded this precedent into the Act itself: A carrier is an entity that sells

---

[85] *Resale Order*, ¶ 17.

[86] *Id.*, ¶¶ 8, 17, 101, 130.

[87] *See, e.g.*, *United States v. Unipoint Techs., Inc.*, 159 F. Supp. 3d 262, 271 (D. Mass. 2016) (citing *Resale Order*); *FTC v. Verity Int'l, Ltd.*, 194 F. Supp. 2d 270, 277 & n.33 (S.D.N.Y. 2002) (same); *Request for Review and/or Waiver of a Decision of the Universal Service Administrator by Park Hill School District Kansas City, Missouri; Schools and Libraries Universal Service Support Mechanism*, Order, 35 FCC Rcd. 4427 (2020) (same); *Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601, ¶ 188 n.458 (2015) (citing the *Resale Order* and holding that resellers of newly defined common carrier services are themselves carriers), *aff'd*, *United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 690 (D.C. Cir. 2016), *abrogated on other grounds by Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018), *vacated in part on other grounds by Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1 (D.C. Cir. 2019).

[88] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended at 47 U.S.C. § 151 *et seq.*) (1996 Act).

telecommunications, "regardless of the facilities used."[89] The Supreme Court has held that this statutory language means that the Act "do[es] not distinguish facilities-based and non-facilities-based carriers."[90]

Furthermore, Section 153(51) defines a telecommunications carrier as an entity that "provid[es]" telecommunications service.[91] In normal usage, when a company bills customers for a service, that company "provides" the service, even though a different company physically supplies it.[92] As this Court noted in *In re United States for an Order Authorizing Roving Interception of Oral Communications*, when a long-distance carrier resells local telephone service to a customer, "from the point of view of the customers, the long-distance carrier is clearly '***the provider*** of the wire or electronic communication service."[93] The same is true here; Digicel does not supply the cell towers, switches, and fiber optic cable needed for its customers to make calls from the United States to Haiti, but that service is what it ***sells***, so it is the "provider" of those services.

The FCC denies that it relied on the fact that Digicel had no facilities in the

---

[89] 47 U.S.C. § 153(53).

[90] *Brand X*, 545 U.S. at 997.

[91] 47 U.S.C. § 153(51).

[92] *In re United States for an Order Authorizing Roving Interception of Oral Commc'ns* (*In re United States*), 349 F.3d 1132, 1140 (9th Cir. 2002).

[93] *Id.* (emphasis added) (cleaned up).

United States to hold that Digicel is not a carrier.[94] Its discussion immediately following that denial, however, shows that the opposite is true:

- It specifically stated that it "considered the *call path* of the wholesale traffic in this case"—that is, the physical facilities the calls traverse.[95]

- It stated that it considered "the role Digicel Haiti played in *handling the traffic exclusively in Haiti*, rather than within the United States or between the United States and Haiti"—that is, where Digicel did and did not perform physical call-handling tasks.[96]

- It had earlier noted that "AT&T and T-Mobile *transported calls* made by Digicel Haiti customers roaming in the United States to one of the *switching gateways* operated by Digicel USA in New York or Florida"—that is, where the physical tasks of transmitting and switching calls occurred, and which entities performed those tasks.[97]

- And it had noted that "Digicel USA, a company separate from Digicel Haiti, *transported the calls* from its *switching gateways* to Haiti, where

---

[94] *Reconsideration* ¶ 10 n.46, 1-ER-6–7.

[95] *Id.*

[96] *Id.*

[97] *Order* ¶ 6 & n.22, 1-ER-19–20.

Digicel Haiti ***terminated the calls on its network***"—again, focused on which entities performed which physical functions in which locations.[98]

After its recitation of which entities had which facilities in which locations performing which functions, both in the *Order* and in the *Reconsideration*, the agency stated that "***[t]hese record facts led the Commission*** correctly to conclude" that Digicel was not a carrier.[99] This frank statement shows that, despite its protestations, when the FCC held that Digicel was not a carrier, it considered, and indeed relied upon, the fact that Digicel itself was not physically involved within the United States in handling the calls that it sold to its customers. But this is exactly what the statute, decades of precedent, and the Supreme Court all say has nothing to do with Digicel's status as a carrier.

### b.  Roaming is a form of resale.

The FCC also claims that Digicel is not a "reseller"—and hence not a telecommunications carrier—because the agency uses the term "reseller" in a specialized way in the context of its regulatory scheme for wireless providers, and within that scheme, "roaming" is not "resale."[100] But while the agency's regulatory labels for different types of wireless arrangements may be relevant for certain

---

[98] *Id.*

[99] *Reconsideration* ¶ 10 n.46, 1-ER-6–7.

[100] *Reconsideration* ¶¶ 12-13, 1-ER-7–9; *Order* ¶ 28 n.117, ¶ 30 & n.122, 1-ER-32–33.

28

purposes, they are irrelevant to the question whether Digicel is a carrier under the Act.

The FCC discussed its wireless classification scheme because UPM pointed out that when the FCC had previously addressed whether roaming was a form of resale, the agency concluded that it was.[101] The *Parts 1 and 63 Order* addressed the reverse of the situation at issue in this case. Here, Digicel is providing calls from the United States to Haiti. There, United States wireless carriers were providing their own customers with the ability to call from overseas back to the United States. But the statutory analysis of those situations is identical, because the Act does not distinguish between calls that start overseas and end in the United States and those that start here and end overseas—both are "foreign communications."[102]

In the *Parts 1 and 63 Order*, the FCC expressly relied on the definitions in the Act to hold that its jurisdiction extended to the resale of international calling in the context of roaming. The agency explained that it "f[ound] determinative" "[f]or purposes of establishing jurisdiction under the Act" the fact that "a U.S.-licensed [wireless] carrier offers its customers a telecommunications service from a point

---

[101] *Amendment of Parts 1 and 63 of the Commission's Rules*, Report and Order, 22 FCC Rcd. 11398 (2007) (*Parts 1 and 63 Order*).

[102] *See* 47 U.S.C. § 152(a) (the Act applies "to all … foreign communication by wire or radio … which originates and/or is received within the United States…"); 47 U.S.C. § 153(21) ("'foreign communication' … means communication … from or to any place in the United States to or from a foreign country…").

outside the United States to a point within the United States."[103] There is no legal or logical distinction between the agency's jurisdiction over calls from overseas to the United States and its jurisdiction over calls from the United States to other countries, such as those sold by Digicel here.

The FCC also made clear in the *Parts 1 and 63 Order* that, at least for purposes of the scope of its jurisdiction, it understood that roaming is a form of resale, "disagree[ing]" with the claim that "international roaming service which allows customers roaming abroad to call back to the United States does not involve the 'resale' of the U.S.-inbound service of a foreign carrier."[104] The FCC explained that, "unless a U.S.-international carrier provides [the] service to its customers [using its own] facilities … ***the carrier effectively resells the U.S.-inbound service*** of another carrier, regardless of whether the underlying carrier-to-carrier arrangement is a resale, roaming, or other type of arrangement."[105] In other words, the agency held that when the question—as here—is the reach of the Act, what matters is that one

---

[103] *Parts 1 and 63 Order*, ¶ 19. *See id.* ("the fact that the U.S. [wireless] carrier's customer originates a U.S.-inbound call on the facilities of a foreign carrier does not affect our jurisdiction. The use of a foreign-authorized facility by a U.S.-licensed telecommunications carrier to provide its customers a telecommunications service that originates in a foreign point and terminates within the United States does not divest the Commission of its Title II jurisdiction [its authority over carrier and carrier services] over the offer of that service.").

[104] *Id.*, ¶ 21.

[105] *Id.* (emphasis added).

30

carrier sells its own customers another carrier's services, using the other carrier's facilities. If that is happening, then "the carrier effectively resells the … service" of the other carrier.[106]

The agency's effort to distinguish the *Parts 1 and 63 Order*[107] is unavailing. It is certainly true that that ruling arose in the context of the formal authorizations required by United States carriers for their back-to-home-country roaming arrangements, and not the parallel arrangements at issue here. But in terms of the agency's authority over Digicel, that is a distinction without a difference: The relevant statutory provisions expressly apply to calls between the United States and a foreign country, no matter which way they are going.

UPM does not dispute that distinctions between regulatory categories like "resale, roaming, or other type of arrangement"[108] might matter when the question is the details of how the agency regulates different types of wireless carriers. But when the question is the scope of the agency's authority under the Act—the question in the *Parts 1 and 63 Order*, and here—what matters is the reality of the carrier's arrangements with its host carriers. Digicel's arrangements with its host carriers fit perfectly within the longstanding definition of resale: "an activity wherein one entity

---

[106] *Id.*

[107] *See Reconsideration* ¶¶ 12-13, 1-ER-7–8.

[108] *Parts 1 and 63 Order*, ¶ 21.

subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public (with or without 'adding value') for profit."[109]

### 2. The details of Digicel's contractual offers are irrelevant to its status as a carrier.

The FCC also based its holding that Digicel is not a telecommunications carrier under the Act on the ground that, even assuming Digicel provided its customers with telecommunications in the United States, the **contracts** for its services were entered into in Haiti. According to the agency, the Act does not address "offers … made exclusively outside the United States."[110] This reading makes no sense: There is no reason to think that Congress would define the agency's authority in terms of contractual offers, rather than in terms of what an entity actually does.

Linguistically, the term "offering" can function both as a noun and a verb. One can say that a store is "offering" to sell shoes (verb). But one can also say that the store's "offering" is the shoes that it sells (noun). By defining "telecommunications service" (noun) as "the offering of telecommunications" (noun), Congress pragmatically focused on what an entity is selling—its

---

[109] *Resale Order*, ¶ 17.

[110] *Order* ¶ 18, 1-ER-27. *See also*, *e.g.*, *Order* ¶ 18, 1-ER-27 (the issue is "whether the 'engagement for hire'" and the "offer of service … occurs within—or exclusively outside—the United States"); *Order* ¶¶ 19-21, 1-ER-27–28.

"offering"—and not on the details of contract formation (where and how its "offer" occurs).

The FCC's reading also took the agency into unauthorized territory. "[T]he Communications Act does not govern … issues[] such as contract formation and breach of contract, that arise in a detariffed environment."[111] State common law issues, such as contract formation, "by definition, [do] not arise under [the Act], and thus fall[] outside the scope of the Commission's jurisdiction."[112] Moreover, "there is no federal common law of contracts that the FCC can apply" in assessing the relationship between carriers (such as Digicel here) and their customers (such as UPM and others who made use of Digicel's services).[113] There is, therefore, no basis for the FCC's theory that the details of how Digicel enters into contracts matters to its status as a carrier.

On the contrary, an entity's status as a carrier depends on what the entity actually does. "'[I]t has long been held that a common carrier is such by virtue of

---

[111] *Ting*, 319 F.3d at 1133 (quoting *Policy and Rules Concerning the Interstate, Interexchange Marketplace; Implementation of Section 254(g) of the Communications Act of 1934*, *as amended*, Order on Reconsideration, 12 FCC Rcd. 15014, ¶ 77 (1997), (cleaned up), *recons. granted in part by Policy and Rules Concerning the Interstate, Interexchange Marketplace*, 14 FCC Rcd. 6004 (1999)).

[112] *All Am. Tel. Co., Inc. v. Fed. Commc'ns Comm'n*, 867 F.3d 81, 94 (D.C. Cir. 2017).

[113] *Ting*, 319 F.3d at 1146.

the actual activities he carries on.'"[114] What Digicel *did* is provide its customers in the United States with calls from the United States to Haiti. It charged for those calls from within the United States. It was thus engaging in the business of providing that service in the United States.

### 3. Digicel is a carrier even under the FCC's "location of offer" theory.

Even were there any validity to the FCC's location-of-offer theory, the agency's application of that theory to the facts here cannot be sustained. According to the FCC, when Digicel sold SIM cards to third-party distributors in Haiti for later resale to then-unknown third-party members of the public, its offer to the distributors constituted its "entire offer" to provide wireless services—including an offer to carry calls from the United States to Haiti at the behest of the then-unknown third-parties who would buy the SIM cards from the distributors.[115] Normal contract principles, however, show that this conclusion is wrong.

The content of an offer is determined by what a reasonable person would understand from the offeror's objective manifestations of willingness to enter a

---

[114] *AT&T Mobility*, 883 F.3d at 860 (quoting *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976)) (cleaned up). *See also FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 60 (2d Cir. 2006); *Eagleview Techs., Inc. v. MDS Assocs.*, 190 F.3d 1195, 1197 (11th Cir. 1999).

[115] *Order ¶* 21, 1-ER-28; *Reconsideration ¶* 14, 1-ER-10.

bargain.[116] The terms of an offer are thus not affected by the subjective desires or expectations of either the offeror or the offeree.[117] In fact, the agency itself has acknowledged that when, as here, a service is being sold outside the context of a formal tariff, the terms associated with the service will be established by the application of normal contract law.[118]

For the FCC's holding to survive review, even under its own theory, the objective circumstances of Digicel's sale of SIM cards in Haiti would have to

---

[116] *See* RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.")*; see also id*., § 4 (offers may be express or implied); *see also* 1 WILLISTON ON CONTRACTS § 4.10 (4th ed. 1999) (offer exists if the purported offeree "reasonably [could] have supposed that by acting in accordance with it a contract could be concluded"); *City of Canby v. Rinkes*, 136 Or. App. 602, 902 P.2d 605, 610 (1995) (whether parties entered into an agreement depends not on whether their "minds met" but on whether the parties agreed to the same, express terms and on whether those terms constitute an enforceable agreement); *Real Est. Loan Fund Oreg. Ltd. v. Hevner*, 76 Or. App. 349, 709 P.2d 727, 730 (1985) ("In determining whether a contract exists and what its terms are, we examine the objective manifestations of intent, as evidenced by the parties' communications and acts.") (citations omitted).

[117] With no citation to any contract cases, or indeed to any authority at all, the FCC simply declares that it "disagree[s] with the contention that Digicel Haiti's subjective intent about how its cards were to be used is irrelevant to our analysis." *Order* ¶ 24 n.104, 1-ER-29–30. But the agency cannot have it both ways: it cannot rest its jurisdictional analysis on the niceties of contract law and then ignore the plain requirements of contract law in reaching its conclusion.

[118] *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, Report and Order, Declaratory Ruling, and Further Notice of Proposed Rulemaking, 32 FCC Rcd. 11128, ¶¶ 143-145 (2017). *See also*, *e.g.*, RESTATEMENT (SECOND) OF CONTRACTS §§ 1-5 (1981).

communicate to a reasonable person that in making those sales, Digicel was offering not just a SIM card—a small computer chip that can be inserted into a mobile device—but also the entire packet of telecommunications services it offered, including completing calls from the United States to Haiti at RLYH rates.

No reasonable person considering the act of selling SIM cards to distributors could conclude that its objective meaning was an offer of a specific service to the then-unknown third parties who would eventually purchase and use the SIM cards.[119]

For starters, Digicel never communicated with the ultimate purchasers of the SIM cards—except, as described below, to specifically offer the RLYH plan to SIM card holders in the United States—and did not even know who they were.[120]

Furthermore, even if one could construe the sale of SIM cards (in Haiti) as containing an offer to sell calls from the United States to Haiti, that would not mean that the SIM card sales would be the "entire offer" that Digicel made.[121] To the

---

[119] UPM also argued that the idea that sales of SIM cards embody an offer of service contradicted agency precedent and the terms of the Act, which treat equipment and services differently. *See UPM Reconsideration Petition*, 2-ER-50–52. The agency dodged the issue, claiming that UPM's argument was untimely. *Reconsideration* ¶¶ 18-19, 1-ER-12–13. Timely or not, the agency plainly erred by conflating equipment—a SIM card—and telecommunications service—calls from the United States to Haiti.

[120] *Boute Deposition* at 36:24-37:6, 3-ER-370–71.

[121] *See Order* ¶ 21, 1-ER-28; *Reconsideration* ¶ 14, 1-ER-10.

contrary, Digicel clearly also made an ***additional*** offer in the United States, by expressly inviting SIM card holders in the United States to subscribe to the RLYH plan. The parties stipulated that, when a SIM card with sufficient money in its account first appeared on the network of a United States host carrier, Digicel sent a text message to the device in the United States, inviting the SIM card holder to purchase a RLYH plan. When the SIM card holder indicated "yes" (by responding to the text message), the network responded with another message asking the user to indicate whether the user wanted the 7-day or 30-day version of the service. When the SIM card holder indicated the desired period, Digicel's network deducted the enrollment fee from the SIM card's account ($25 for the 30-day plan) and sent a confirmation message to the SIM card.[122]

Unlike selling SIM cards to distributors in Haiti, ***these*** facts clearly show that Digicel, in the United States, made offers to provide calls from the United States to Haiti, and how its contracts to do so were formed. Digicel took affirmative steps to offer RLYH—and indeed two distinct versions of RLYH—to SIM card holders in the United States. These offers to carry calls from the United States to Haiti were individually communicated to, and specifically directed to, subscribers that Digicel

---

[122] *Joint Statement* ¶ 16, 2-ER-97–98.

*knew* were in the United States. They clearly constituted offers, in the United States, to provide telecommunications (calls from the U.S. to Haiti).

Importantly, as the district court held (and the FCC never questioned), Digicel did not impose any express terms or conditions on its services under the RLYH plan.[123] In the absence of formal written terms, the only contractual arrangement Digicel could possibly have with its customers was established in an implied-in-fact contract entered into at the time the customer purchased that plan. The controlling contractual analysis for this situation is the "law of the vending machine," under which automatic sales made entirely by machine constitute implied-in-fact contracts. A vending machine, by its physical configuration, constitutes an implied-in-fact offer to sell the items it contains. If someone puts money into a vending machine and pushes the right buttons, but does not get their soda or candy, the vending machine owner has breached the implied-in-fact contract established by the physical configuration of the machine.[124] Here, the physical configuration of Digicel's system

---

[123] *Summary Judgment Ruling*, 2-ER-253–254 & n.11.

[124] Jonathan G. Rohr, *Smart Contracts and Traditional Contract Law, or: The Law of the Vending Machine*, 67 Clev. St. L. Rev. 71, 74–81 (2019) (discussing *Chaffin v. Atlanta Coca Cola Bottling Co.*, 194 S.E.2d 513, 515 (Ga. Ct. App. 1972) (implied contract for vending machine sale of a tainted bottle of soda); *Thornton v. Shoe Lane Parking, Ltd.,* 2 QB 163, 165 (1971) (implied contract for purchase of use of parking space via automated machine at entry); *Slater v. Fid. & Cas. Co. of N.Y.*, 98 N.Y.S.2d 28, 29 (N.Y. App. Div. 1950) (contract for flight insurance sold via vending machine); *Steven v. Fid. & Cas. Co. of N.Y.*, 377 P.2d 284, 298 (Cal. 1962) (same);

permitted anyone with a SIM card to subscribe to RLYH by depositing enough money in the account and sending the right codes to Digicel. This constituted an implied-in-fact offer of the RLYH plan wherever the SIM card owner could purchase the plan—including in the United States, where Digicel expressly offered the plan upon learning that a SIM card was present here. Digicel thus clearly made "offers" to sell its services in the United States.[125]

* * * * *

Digicel sold calls from the United States to Haiti to customers in the United States. That is all that is needed for it to be a carrier subject to the Act. The details of its contractual offers are irrelevant under the Act. If offers do matter, however, it is clear that Digicel offered its services in the United States, to customers in the United States. The fact that Digicel has no United States facilities does not matter, and it also does not matter that for certain regulatory purposes the FCC distinguishes "roaming" from "resale." The FCC's conclusion that Digicel was not a carrier is

---

*Lachs v. Fid. & Cas. Co. of N.Y.*, 306 N.Y. 357, 118 N.E. 555, 557 (N.Y. 1954) (same)).

[125] Even if a SIM card holder did not respond to the express offers that Digicel made when a SIM card first registered on a host carrier's network in the United States, at any time the SIM card holder in the United States could send a text message to Digicel indicating a desire to enroll in the RLYH plan. Digicel's network would respond with the offer-and-acceptance exchange described above. *Joint Statement* ¶ 16, 2-ER-97–98. The fact that Digicel's system was always ready to respond to a request to enroll in the RLYH program is itself an implied-in-fact offer, akin to a vending machine ready to provide snacks at any time.

39

arbitrary, capricious, and contrary to law, and should be vacated and reversed.

## II. The FCC Erred In Concluding That Digicel Did Not Violate The Act By Cutting Off UPM's Services.

After concluding that Digicel was not a carrier, the FCC compounded its error by holding that even if Digicel were a carrier, cutting off UPM's services did not violate the "unjust and unreasonable" and "unreasonable discrimination" standards in Sections 201(b) and 202(a).[126] It reached this erroneous conclusion by interpreting those statutes as calling for a vague "totality of the relevant circumstances" test,[127] rather than applying the statute in light of its purpose and the agency's own precedent.

### A. The FCC misconstrued the "just and reasonable" standard of Sections 201(b) and 202(a).

The Act outlaws "unjust and unreasonable" practices, and "unreasonable discrimination" by carriers.[128] Although the application of these broad terms may not always be self-evident, both the purpose of the statute and extensive FCC precedent show that bans on resale, such as the one imposed by Digicel, are unlawful.

---

[126] *See Order* ¶¶ 30-36, 1-ER-32–37; *Reconsideration* ¶¶ 20-24, 1-ER-13–16.

[127] *Order* ¶ 31, 1-ER-33–34.

[128] 47 U.S.C. §§ 201(b), 202(a).

1.    **The purpose of Sections 201(b) and 202(a) is to protect consumers from carrier market power and thus to promote competition.**

As this Court observed in *Ting*, "[t]he purpose of the 1996 Act," which amended the Communications Act of 1934, "was 'to provide for a pro-competitive, de-regulatory national policy framework … by opening all telecommunications markets to competition.'"[129] Consistent with and reinforcing this general pro-competitive purpose of the Act as a whole, the specific purpose of Sections 201(b) and 202(a) is to protect customers of carriers from unjust and unreasonable practices. This includes discrimination against resellers, which in all but the rarest of circumstances are uniformly anticompetitive.

The FCC explained this purpose in detail in 1998, in rejecting a request to forbear from applying Sections 201(b) and 202(a) to wireless carriers.[130] As the agency noted in that order, "Sections 201 and 202 [codify] the bedrock consumer protection obligations of a common carrier."[131] The provisions thus "guarantee[] consumers the basic ability to obtain telecommunications service on no less

---

[129] *Ting*, 319 F.3d at 1132 (quoting H.R. Rep. No. 104-458 (Conf. Rep.), at *113 (1996), *as reprinted in* 1996 U.S.C.C.A.N. 124).

[130] *Personal Communications Industry Association's Broadband Personal Communications Services Alliance's Petition for Forbearance for Broadband Personal Communications Services*, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 13 FCC Rcd. 16857 (1998).

[131] *Id.* at ¶ 15.

favorable terms than other similarly situated customers."[132] This applies in particular to "customers whom [the carriers] may view as less desirable."[133] And more specifically, these provisions apply to protect resellers. Without sections 201 and 202, the FCC stressed, "Carriers might … prohibit or unreasonably restrict resale of their services, thereby harming consumers by restricting potential competition by resellers."[134]

The upshot for purposes of this case is that, confronted with the uncontested, admitted situation of Digicel banning resale of its services, the FCC should have presumed that Digicel's practice was unjust and unreasonable and demanded that Digicel provide a strong, pro-competitive, pro-consumer justification for that practice. Instead, it applied an amorphous "totality of the relevant circumstances" test,[135] which led it far afield from the pro-competitive, customer-protective purposes of the Act.[136]

---

[132] *Id.*

[133] *Id.* at ¶ 23.

[134] *Id.* at ¶ 26.

[135] *Order* ¶ 31, 1-ER-33–34.

[136] Apparently in an effort to avoid the force of the Act and its own precedents, the FCC suggests, without holding, that UPM might not really be a "reseller," either because it supposedly "transformed" Digicel's services by reselling them to customers with different usage patterns, *Order* ¶ 31 n.129, 1-ER-33–34; *see also Reconsideration* ¶¶ 12, 13 & n.59, 24 n.114, 1-ER-7–9, 15–16, or because it did not seek a formal wholesale or resale contract with Digicel. *Order* ¶ 36, 1-ER-36–37;

42

### 2. FCC precedent shows that resale restrictions are unjust, unreasonable, and unreasonably discriminatory because they permit carriers to maintain and enhance market power.

Nearly fifty years of agency precedent shows that restrictions on resale violate Sections 201 and 202, establishing that (a) carriers with market power abuse that power by engaging in discriminatory pricing—that is, charging different customers different rates for the same service; (b) resale undercuts discriminatory pricing because the reseller buys the service at the lower available price and resells it to customers who would otherwise be forced to pay the higher price; (c) carriers restrict resale to maintain their ability to engage in discriminatory pricing schemes; and, therefore (d) it is unjust and unreasonable, and unreasonably discriminatory, for carriers to restrict resale.

The FCC's first clear statement explaining why resale restrictions are unjust and unreasonable is the *Resale Order* from 1976. There, the specific service at issue

---

*Reconsideration* ¶ 4 n.22. Neither consideration affects UPM's status as a reseller. As to changing the service, there is no requirement in the statute, in agency precedent, or in common sense that a reseller's customers use the resold services in exactly the same way as the carrier's other customers do. To the contrary, the definition of resale expressly contemplates that the reseller may "add value" to— that is, change—the service it is reselling. *Resale Order*, ¶ 17. As to contracts, while some resellers may seek or need special contractual terms (discounted prices, special ordering and billing arrangements, etc.), UPM did not, and nothing in the definition of resale requires any special or separate contract. And, in any event, Digicel admitted below, in response to UPM's complaint at the FCC, that UPM was a reseller. *See UPM Complaint* ¶ 17, 2-ER-201; *Digicel Answer*, 2-ER-180.

was private line services, but the agency's reasoning was not so limited. The FCC held that "unlimited resale and sharing of *all services* … is just and reasonable, and … tariff provisions which prevent or restrict such practices are unjust and unreasonable, and thus unlawful."[137] The agency clarified that "carriers [cannot] deny service to resale entities merely because the latter offer competition to the carriers,"[138] and that "so-called 'single customer' provisions [that indirectly ban resale by requiring a service to be used by one customer only] are unjustly and unreasonably discriminatory, and accordingly unlawful."[139]

In 1980, the FCC extended that logic and banned resale restrictions for all domestic switched services (that is, normal telephone service), holding that such restrictions were unjust and unreasonable.[140] The agency stated that resale restrictions "prevented normal economic activities such as arbitrage, which could help insure that rates are cost-based."[141] And it summarized the benefits of resale (and thus the harms from banning it) as including "increased incentives for cost-

---

[137] *Resale Order*, ¶ 130 (emphasis added).

[138] *Id.* ¶ 41.

[139] *Id.* ¶ 130.

[140] *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services*, Report and Order, 83 F.C.C.2d 167, ¶ 12 (1980), *aff'd*, *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 746 F.2d 1492 (D.C. Cir. 1984).

[141] *Id.* ¶ 2 (footnote omitted).

based pricing of the services, reduction in required enforcement of Sections 201(b) and 202(a) and more efficient use of network capacity."[142]

Notably, the FCC stressed in this 1980 order that "arbitrage" is in the public interest, explaining that "arbitrageurs (entities purchasing a product in one market and reselling it in another market for a guaranteed profit) are free to search out and capitalize upon attempts by the telephone company to charge different prices for the same product."[143] Ironically, the FCC in the rulings below paints "arbitrage" as somehow nefarious.[144]

A year after the domestic switched services order barred resale restrictions for normal telephone service, the FCC applied this same logic to wireless services, banning resale restrictions by cellular service providers.[145] Here too, the agency noted that the purpose of banning resale restrictions was to prevent price

---

[142] *Id.* ¶ 4 n.8; *see also id.* ("Other anticipated benefits … [include] better network management, improved marketing of communications services and facilities, wider variety of communications offerings, and increased research, development, and implementation of communications technology."); *id.* ¶ 9 (eliminating resale restrictions "will have a number of salutary public interest effects, including the fostering of innovation and the introduction of new technology, especially new ancillary devices.").

[143] *Id.* ¶¶ 2, 18 (footnote omitted).

[144] *Order* ¶ 33, 1-ER-35; *Reconsideration* ¶¶ 4, 20 n.93, 24, 1-ER-4, 13–16.

[145] *An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems*, Report and Order, 86 F.C.C.2d 469, ¶¶ 103-107 (1981).

45

discrimination.[146] That same year, The FCC has also held that the pro-competitive benefits of resale apply in the context of international services (such as the calls from the United States to Haiti at issue here). In that context, the FCC stated that "the public interest in cost-based international telecommunications will be served by the adoption of policies that encourage resale of international telecommunications services."[147] This ruling applies directly to this case: UPM was engaged in "resale of [Digicel's] international telecommunications services"—which the agency said it would "encourage."

The logic of all these precedents applies fully to UPM's resale of Digicel's services. UPM created competitive options for its carrier-customers with calls to get to Haiti, and at the same time put pressure on Digicel's anticompetitive price discrimination practices.[148]

Given the pro-competitive purpose of the Act and this precedent, the Court

---

[146] *Id.* ¶ 104.

[147] *Regulation of International Accounting Rates*, First Report and Order, 7 FCC Rcd. 559, ¶ 8 (1991); *see also id.* ("the extension of unlimited resale into the international telecommunications market would yield the same public benefits in that market" as "in the U.S. domestic telecommunications market").

[148] In addition to citing these precedents to the agency below, UPM provided an expert economist's declaration explaining why the economic and policy logic of these precedents applied fully to UPM's resale of Digicel's services. *See* Expert Disclosure and Declaration of Joseph Gillan, 2-ER-106–130 (discussing history of Commission orders explaining the public benefits of resale). By contrast, Digicel presented no economic analysis of any kind.

should rule that blocking resale is unjust, unreasonable, and unreasonably discriminatory under Sections 201(b) and 202(a), unless there is a strong countervailing reason for permitting it. This is the only interpretation that is consistent with the purposes of the Act and the agency's own precedent.

### 3. The exceptional situations where some resale restrictions are permitted confirm that Digicel's actions were unjust and unreasonable.

In rejecting UPM's resale argument, the FCC noted two situations where it has found there to be countervailing considerations sufficient to permit relaxation of the normal ban on resale restrictions: (a) when one facilities-based United States wireless carrier seeks to resell the services of another facilities-based wireless carrier in an area where both are licensed to serve; and (b) when a competing local exchange carrier seeks to obtain, at statutorily mandated wholesale rates, the services of an incumbent local exchange carrier under Section 251(c)(4).[149] These exceptional situations are irrelevant to the justness and reasonableness of Digicel's behavior.

*(a) The "wireless resale" rule.* In 1993, Congress authorized the FCC to introduce new competition in the wireless industry by auctioning off more spectrum for personal wireless services.[150] In conjunction with that new competition, in 1997

---

[149] *Order* ¶ 31 n.129, 1-ER-33–34; *Reconsideration* ¶ 13 n.60, 1-ER-8–9.

[150] *See Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, Notice of Proposed Rulemaking, 8 FCC Rcd. 7635, ¶ 1 (1993).

the FCC issued the "wireless resale" rule, under which the agency expressly required existing facilities-based wireless carriers to permit new, competing facilities-based wireless carriers—that is, carriers with new spectrum licenses covering the same geographic area—to resell the existing carriers' services over the next five years.[151] The reason for this rule was that the agency wanted the new licensees to begin offering service and building a customer base even though—as new licensees—they did not yet have their own networks. The rule expressly sunset in 2002, because the agency expected the then-no-longer-new licensees to have built their own networks, and to be responsible for maintaining and expanding them on an ongoing basis.

Although it is true that after this rule sunset, the FCC no longer expressly banned all resale restrictions in the context of facilities-based wireless carriers with overlapping license areas,[152] that has nothing to do with this case.[153] The point of permitting one facilities-based wireless carrier to deny resale to a competing facilities-based wireless carrier is to prevent the would-be reseller—who has its own wireless spectrum and its own obligation to build a network—from free riding on

---

[151] *Interconnection & Resale Obligations Pertaining to Commercial Mobile Radio Services*, First Report and Order, 11 FCC Rcd. 18455, ¶¶ 1, 29, 30 (1996) (*CMRS Interconnection Order*), *aff'd as modified*, FCC 99-250, 1999 WL 759700 (Sept. 27, 1999).

[152] *Id.*

[153] *See Order* ¶ 30 & n.122, 1-ER-32–33; *Reconsideration* ¶ 13 & n.58, 1-ER-8–9.

the facilities of its competitor.[154] Relieving one facilities-based wireless carrier of the obligation to resell services to a facilities-based competitor serves the independent statutory goal of requiring all spectrum licensees to build their own networks.[155] Indeed, in the very order in which the FCC found that there were countervailing considerations that justified relaxing the ban on resale restrictions in this context, the agency nonetheless explained at length why banning resale restrictions is generally pro-competitive.[156] And, when this special rule for facilities-based wireless carriers was allowed to sunset, the FCC expressly held that Section 201(b) and 202(a) would continue to apply and that the agency would entertain complaints that particular resale restrictions were unjust and unreasonable.[157]

Neither this rule nor its sunset has any application here. Neither UPM nor Digicel is a facilities-based wireless carrier, and neither holds any spectrum licenses in the United States. So, neither needs to be encouraged to build out a physical

---

[154] *CMRS Interconnection Order*, ¶ 28.

[155] *Id.*

[156] *Id.* ¶¶ 10-11.

[157] *Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services; Personal Communications Industry Association's Broadband Personal Communication Services Alliance's Petition for Forbearance for Broadband Personal Communication Services; Forbearance from Applying Provisions of the Communications Act to Wireless Telecommunications Carriers; Further Forbearance from Title II Regulation for Certain Types of Commercial Mobile Radio Services*, Memorandum Opinion and Order on Reconsideration, 14 FCC Rcd. 16340, ¶ 21 n.51 (1999).

wireless network or to be protected from free riding on their physical wireless network. This exception to the general ban on resale restrictions thus has no relevance here.

**(b) Special resale obligations of incumbent local exchange carriers under Section 251(c)(4).** The other example of exceptions to an absolute ban on resale restrictions to which the FCC pointed relates to the special resale obligations of incumbent local exchange carriers, established by Section 251(c)(4) as part of Congress' effort to open previously monopolized landline local exchange markets to competition. Section 251(c)(4) required incumbent monopolist local carriers to offer all their "retail" services to competing local carriers at regulatorily determined discounted rates.[158] Under this provision, state-level utility regulators were permitted to allow an incumbent to restrict resale of monopoly services that regulators had required to be provided at low rates to specific groups of customers (for example, residential customers) to that same group of customers.[159]

The basis for this exception to incumbent carriers' resale obligations was that Congress wanted state regulators to have the option to prevent competitors from

---

[158] 47 U.S.C. § 251(c)(4)(A).

[159] 47 U.S.C. § 251(c)(4)(B); *see Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 FCC Rcd. 15499, ¶ 962 (1996) (limiting resale of residential service to residential customers).

obtaining, at statutorily mandated wholesale rates, services that those regulators had previously limited to specific groups of customers (such as residential customers), only to resell those services to customers outside the designated customer group (such as business customers). In effect, in the pre-competitive, monopoly world prior to the 1996 Act, state regulators had expressly required certain forms of price discrimination in local telephone service, generally to provide lower rates to residential and low-income customers than those charged to business customers, even for the same service. The point of this aspect of Section 251(c)(4) was to permit state regulators to continue those regulatorily mandated arrangements in the case of new competitors reselling the services of the incumbents.

None of the reasons for this exception apply here. Digicel was not an incumbent local carrier. UPM was not a competing local carrier. Digicel's wireless services were not limited by regulation to particular groups. And UPM was not seeking to obtain Digicel's services at statutorily mandated wholesale rates. This highly specific statutory exception to the general rule banning resale restrictions has no relevance to this case.

### B.    The FCC's justifications for Digicel's actions are unsupportable.

Given the basic rule that resale restrictions generally are "unjust and unreasonable" practices, and involve "unreasonable discrimination," the FCC's conclusion Digicel's termination of UPM's service was acceptable cannot withstand

review.

The parties stipulated that Digicel cut off UPM's SIM cards because UPM was reselling the calls it authenticated using those SIM cards.[160] In other words, Digicel cut off UPM to support its discriminatory pricing regime for calls from the United States to Haiti. Digicel wanted to require carriers with calls bound for its network in Haiti to route those calls in a manner that would require the carriers to pay Digicel $0.23 per minute. UPM, by reselling service under the RLYH plan to those carriers, made calls to Digicel's network in Haiti available to its carrier-customers at lower rates.[161] This arbitrage undercut Digicel's price discrimination scheme—which is what Digicel was trying to prevent.

For Digicel's actions to be just and reasonable, Digicel (or the FCC) was therefore required to identify some countervailing consideration that would justify Digicel's action. Neither was able to do so. It is uncontested that Digicel had a share of 70% of the market for telephone service in Haiti.[162] This means that it plainly had market power with respect to terminating calls on its network there. So, there is no basis for concluding that the market at issue here was adequately competitive. The

---

[160] "[Digicel] used various technical means to determine if a SIM card was being used in a manner inconsistent with use by an individual subscriber, including, specifically, if the SIM card was being used to route third-party calls onto [Digicel's] network." *Joint Statement* ¶ 18, 2-ER-98.

[161] *Joint Statement* ¶ 12, 2-ER-96; *UPM Witness Statements*, ER-307.

[162] *UPM Complaint* ¶ 18, 2-ER-202; *Digicel Answer*, ER-180.

FCC, however, suggested three other possible justifications for accepting Digicel's conduct, but none is valid.

### 1. The jury verdict does not support the FCC's rulings.

The FCC relied heavily—indeed, pervasively—on the civil jury verdict that UPM engaged in "fraud" as a basis to justify Digicel's actions.[163] But as noted above, the FCC lacks both the authority and the expertise to analyze state common law issues.[164] Its reliance on the verdict reveals that lack of expertise.

The district court held that resale of Digicel's services (or "bypass") was ***not*** fraud.[165] This ruling makes complete sense: UPM made no misrepresentations to Digicel in subscribing to Digicel's services; it did not "clone" any SIM card information; it did not take any steps to alter the Caller ID information associated with the services that it bought from Digicel; it subscribed to those services the same way any other customer did; and it paid Digicel its full retail rate, under the RLYH

---

[163] *Order* ¶¶ 13, 15, 23, 30-31, 33, 36, 1-ER-25–26, 28–29, 32–37 (referencing UPM's alleged "fraud"); *Reconsideration* ¶¶ 2, 5, 20-22, 24, 1-ER-2–4, 13–16 (same).

[164] *Ting*, 319 F.3d at 1146; *All Am. Tel. Co.*, 867 F.3d at 94.

[165] *UPM Reconsideration Petition*, 2-ER-60–61 ("The District Court found, and trial judge instructed the jury at least 8 times, that "bypass" is not fraud, that is, that UPM's purchase of Digicel-Haiti services and reselling those services to UPM's own customers was not fraudulent, illegal, or tortious."); 2-ER-60 n.46 (citing *Trial Transcript* at 26-27, 439, 831, 835, 1074, 1076, 2-ER-78–79, 84, 87–88, 92–93).

plan, for every minute of service that UPM used.[166]

Since UPM's resale of Digicel services was not itself fraud, the only question before the jury was whether it was fraud under Oregon law for UPM to take steps to slow down Digicel cutting UPM off—that is, to slow down Digicel's ability to identify which SIM cards were being used for resale.[167] According to the FCC and Digicel, it was reasonable for Digicel to cut off UPM's services because it was trying to prevent "fraud."[168] But considering what the jury's verdict actually meant, this is nothing more than circular reasoning: It was supposedly reasonable for Digicel to cut off UPM's services for no other reason than that UPM was trying to keep Digicel from cutting off its services. This is arbitrary and irrational, because it avoids the underlying, actual question, which is whether Digicel had any *lawful* reason to cut UPM off in the first place. The decades of FCC precedent discussed above show that it did not.

The FCC's claim that Digicel's actions were reasonable as measures to

---

[166] *See generally*, Opinion and Order (Jul. 29, 2022), 3-ER-394–395; *see also Summary Judgment Ruling*, 2-ER-265–266 ("[Digicel], however, presents no evidence of 'cloning' of data.… Similarly, [Digicel] alleged that UPM used these SIM cards to misrepresent the call's international origin. [Digicel], however, presents no evidence to support this allegation.") (citation omitted); Opinion and Order (Jul. 13, 2022), 2-ER-329–330.

[167] That UPM took such steps is not contested here. *See Joint Statement* ¶ 19, 2-ER-98.

[168] *Order* ¶¶ 30, 33 & nn.136-137, 1-ER-32–33, 35–36; *Reconsideration* ¶¶ 20-21, 1-ER-13-14.

prevent fraud,[169] fails for this reason. The only "fraud" that Digicel was trying to prevent was resale, which is not fraudulent, and which Digicel had no right to try to prevent. Similarly, the FCC's claim that fraud prevention can outweigh the importance of promoting competition,[170] makes no sense here, where what Digicel was preventing was competition via resale, not fraud.

Indeed, by focusing on the fact that a jury **labeled** UPM's actions as fraud, rather than evaluating UPM's actual behavior in the context of Digicel's price discrimination scheme, the FCC's ruling had the effect of importing the idiosyncrasies of Oregon tort law—a topic as to which the agency has no authority or expertise—into Sections 201(b) and 202(a). But those provisions establish standards of behavior for carriers that are independent of and unaffected by state tort law.

### 2. The Haitian government's policies on resale have no bearing on the lawfulness of Digicel cutting off UPM's services.

The FCC noted that the Haitian government forbids resale of Digicel's services.[171] But the Haitian government's policies apply in Haiti, not in the United States. The Haitian government has no authority over Digicel's actions here.

---

[169] *See Order* ¶¶ 33 & n.137, ¶ 36, 1-ER-29–30, 35–37.

[170] *Id.*

[171] *Order* ¶ 33 n.136, 1-ER-35; *Reconsideration* ¶ 21, 1-ER-14.

Moreover, the FCC has expressly ruled that the pro-competitive goals of the Act take precedence over any anticompetitive requirements of foreign governments.[172] Giving any weight in the United States to the Haitian government's anticompetitive polices contradicts both the pro-competitive purpose of the Act and the agency's own precedent.

        **3.    The fact that resale caused Digicel's host carriers to demand and receive price reductions shows that those restrictions were anticompetitive and contrary to the Act.**

Finally, the FCC noted that resale of Digicel's services in the United States caused issues with Digicel's roaming partners.[173] But the record shows that those issues boiled down to the roaming partners putting pressure on Digicel to lower its call termination rates—and achieving lower rates as a result.[174] In other words, UPM's resale of Digicel's service had exactly the expected, intended, and beneficial effect—making it harder for Digicel to maintain its price discrimination scheme by forcing it to lower some of its monopolistic, above-cost prices. It was arbitrary and

---

[172] *Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service*, Order, 18 FCC Rcd. 6077, ¶ 11 (2003); *id.*, *passim*.

[173] *Order* ¶ 33 n.136, 1-ER-35–36 (Digicel "unable to negotiate preferential terms" in roaming agreements); *Reconsideration* ¶ 21 n.99, 1-ER-14.

[174] *See UPM Reply*, 4-ER-467–472 (explaining that the provisions of Digicel's roaming agreements which it claimed were imposed on it due to the resale of its services had the effect of lowering the rates its host carriers paid to deliver calls to Haiti).

capricious to treat this effect of UPM's resale as a justification for Digicel's behavior—as a "legitimate business need"—rather than as an indication that cutting off UPM's services was unjust and unreasonable. More generally, it was arbitrary and capricious to treat Digicel's issues in dealing with its host carriers arising from resale Digicel was unable to unlawfully suppress as a justification for unlawful resale restrictions in the first place.

## CONCLUSION

This Court should vacate and reverse the FCC's rulings below.

Respectfully submitted,

/s/ David M. Gossett
David M. Gossett
Christopher W. Savage
Katherine D. Sheriff
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
chrissavage@dwt.com
katherinesheriff@dwt.com

*Attorneys for Petitioner UPM Technology, Inc.*

Dated: June 4, 2025

## CIRCUIT RULE 28-2.6 STATEMENT OF RELATED CASES

I am unaware of any related cases currently pending in this Court.

**Signature**:  s/ *David M. Gossett*

**Date**: June 4, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s): 25-227**

I am the attorney or self-represented party.

**This brief contains 13,566 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** _s/ David M. Gossett_        **Date:** June 4, 2025

59

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 4, 2025                    s/ *David M. Gossett*
                                        David M. Gossett

# STATUTORY ADDENDUM

**Page**

A.  5 U.S.C. § 706. Scope of review ...................................................62

B.  47 U.S.C. § 152. Application of Act ..........................................63

C.  47 U.S.C. § 153. Definitions ......................................................64

D.  47 U.S.C. § 201. Service and charges .......................................65

E.  47 U.S.C. § 202. Discriminations and preferences ...................66

F.  47 U.S.C. § 251. Interconnection .............................................67

G.  47 U.S.C. § 332. Mobile services .............................................68

### A.     5 U.S.C. § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

   (1)     compel agency action unlawfully withheld or unreasonably delayed; and

   (2)     hold unlawful and set aside agency action, findings, and conclusions found to be—

      (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      (B)     contrary to constitutional right, power, privilege, or immunity;

      (C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

      (D)     without observance of procedure required by law;

      (E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

      (F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

### B.  47 U.S.C. § 152. Application of Act

(a)  The provisions of this Act shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in [the Philippine Islands or] the Canal Zone, or to wire or radio communication or transmission wholly within [the Philippine Islands or] the Canal Zone. The provisions of this Act shall apply with respect to cable service, to all persons engaged within the United States in providing such service, and to the facilities of cable operators which relate to such service, as provided in title VI.

[…]

### C.     47 U.S.C. § 153. Definitions

For the purposes of this Act [47 USCS § 151 *et seq.*], unless the context otherwise requires—

[…]

(21)  *Foreign communication*. The term "foreign communication" or "foreign transmission" means communication or transmission from or to any place in the United States to or from a foreign country, or between a station in the United States and a mobile station located outside the United States.

[…]

(50)  *Telecommunications*. The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

(51)  *Telecommunications carrier*. The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226). A telecommunications carrier shall be treated as a common carrier under this Act only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

[…]

(53)  *Telecommunications service*. The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

### D. 47 U.S.C. § 201. Service and charges

[…]

(b)    All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is hereby declared to be unlawful: Provided, That communications by wire or radio subject to this Act may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this Act or in any other provision of law shall be construed to prevent a common carrier subject to this Act from entering into or operating under any contract with any common carrier not subject to this Act, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this Act or in any other provision of law shall prevent a common carrier subject to this Act from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act.

### E.    47 U.S.C. § 202. Discriminations and preferences

(a)    *Charges, services, etc*. It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

[…]

**F.    47 U.S.C. § 251. Interconnection**

[…]

(c)    *Additional obligations of incumbent local exchange carriers*. In addition to the duties contained in subsection (b), each incumbent local exchange carrier has the following duties:

[…]

   (4)    *Resale*. The duty—

   (A)    to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

   (B)     not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

[…]

### G.    47 U.S.C. § 332. Mobile services

[…]

(c)    *Regulatory treatment of mobile services.*

    (1)    *Common carrier treatment of commercial mobile services.*

        (A)    A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this Act, except for such provisions of title II as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208, and may specify any other provision only if the Commission determines that—

            (i)    enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

            (ii)    enforcement of such provision is not necessary for the protection of consumers; and

            (iii)    specifying such provision is consistent with the public interest.