No. 25-227

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UPM TECHNOLOGY, INC.

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Respondent,*

UNIGESTION HOLDING, S.A. D/B/A DIGICEL HAITI

*Intervenor*

Petition for Review of Orders of
The Federal Communications Commission
Proceeding No. 23-64, Enforcement Bureau ID No. EB-23-MD-001
FCC 23-44 and FCC 24-31

## PETITIONER UPM TECHNOLOGY, INC.'S REPLY BRIEF

David M. Gossett
Christopher W. Savage
Katherine D. Sheriff
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
chrissavage@dwt.com
katherinesheriff@dwt.com

*Attorneys for Petitioner UPM Technology, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................... 1

ARGUMENT .......................................................................................... 1

I. Digicel Is A Carrier Subject To The Act. ......................................... 1

    A. Digicel is subject to the Act under Section 152. .................................. 3

        1. U.S.-to-Haiti roaming calls are "foreign communication by wire or radio … which originate[] … within the United States," and subject to Section 152. ................................ 4

        2. Digicel's is "engaged within the United States" in foreign communication. ............................................................................ 6

    B. Regulating Digicel is not an extraterritorial application of the Act. ...................................................................................................... 11

    C. International comity does not exempt Digicel from regulation. ......... 14

    D. Roaming is resale. ............................................................................... 16

II. Cutting Off UPM's Service Violated Sections 201(b) And 202(a). ............. 18

    A. UPM demonstrated that Digicel's price discrimination harmed consumers and the telecommunications market. ................................... 19

    B. No formal presumption is needed to conclude that Digicel violated the Act. ................................................................................... 22

    C. UPM's resale inconvenienced Digicel with its roaming partners because it was working. ....................................................................... 23

    D. UPM's actions did not justify cutting off its services. ........................ 25

CONCLUSION ....................................................................................... 29

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ............................... 30

i

# TABLE OF CONTENTS (continued)

**Page**

CERTIFICATE OF SERVICE ................................................................................31

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AT&T Corp. v. FCC*,
317 F.3d 227 (D.C. Cir. 2003)..............................................................................28

*Cable & Wireless PLC v. FCC*,
166 F.3d 1224 (D.C. Cir. 1999)...................................................................13, 14

*China Unicom (Ams.) Operations Ltd. v. FCC*,
124 F.4th 1128 (9th Cir. 2024).......................................................................9, 11

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)..............................................................................................3

*FTC v. AT&T Mobility*,
883 F.3d 848 (9th Cir. 2018) ..........................................................................1, 5

*FTC v. Verity Int'l, Ltd.*,
443 F.3d 48 (2d Cir. 2006) .........................................................................4, 5, 6

*Kiobel v. Royal Dutch Petroleum Co.*,
569 U.S. 108 (2013)............................................................................................11

*McDonnell Douglas Corp. v. Gen. Tel. Co. of Cal.*,
594 F.2d 720 (9th Cir. 1979) ...............................................................................6

*MCI Telecomms. Corp. v. FCC*,
675 F.2d 408 (D.C. Cir. 1982)...........................................................................20

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Svcs.*,
545 U.S. 967 (2005)..................................................................................2, 9, 23

*Shirk v. United States*,
773 F.3d 999 (9th Cir. 2014) .............................................................................10

*Sprint Corp. v. FCC*,
151 F.4th 347 (D.C. Cir. 2025)............................................................................7

## TABLE OF AUTHORITIES (continued)

**Page(s)**

### Statutes

Communications Act of 1934, *as amended*,
47 U.S.C. § 151 *et seq.* .................................................................................*passim*

§ 152...............................................................................................................2, 3, 4

§ 152(a) ..........................................................................................................*passim*

§ 153(11)...............................................................................................................8, 9

§ 153(50)...............................................................................................................2, 9

§ 153(51)...............................................................................................................2, 9

§ 153(53)...............................................................................................................2, 9

§ 201..................................................................................................................1, 2, 3

§ 201(b)...............................................................................................1, 18, 20, 29

§ 202..................................................................................................................1, 2, 3

§ 202(a) ...............................................................................................1, 18, 29

§ 214.........................................................................................................9, 15, 17

### Regulations

47 C.F.R. § 63.01(a)...............................................................................................15

47 C.F.R. § 63.10(a)(2)....................................................................................10, 14

47 C.F.R. § 63.10(a)(3).............................................................................10, 14, 15

47 C.F.R. § 63.10(c)...............................................................................................15

47 C.F.R. § 63.10(d) ..............................................................................................15

47 C.F.R. § 63.23 ...................................................................................................10

47 C.F.R. § 64.1601 ...............................................................................................27

# TABLE OF AUTHORITIES (continued)

**Page(s)**

**Administrative Materials**

*1998 Biennial Regulatory Review; Reform of the International
Settlements Policy and Associated Filing Requirements*,
Report and Order and Order on Order on Reconsideration,
14 FCC Rcd. 7963 (1999)....................................................................21

*Amendment of Parts 1 and 63 of the Commission's Rules*,
Report and Order, 22 FCC Rcd. 11398 (2007)............................................16, 17

*Connect America Fund*, Report and Order and Further
Notice of Proposed Rulemaking, 26 FCC Rcd. 17663 (2011).....................24, 27

*Implementation of Section 402(b)(2)(A) of the Telecommunications
Act of 1996*, 14 FCC Rcd. 11364 (1999) .............................................................15

*Interconnection and Resale Obligations Pertaining to Commercial Mobile
Radio Services*, 11 FCC Rcd 18455 (1996)........................................................22

*International Settlements Policy Reform; International Settlement
Rates*, First Report and Order, 19 FCC Rcd. 5709 (2004) .................................10

*Market Entry and Regulation of Foreign-affiliated Entities*,
Report and Order, 11 FCC Rcd. 3873 (1995)......................................................14

*Protecting and Promoting the Open Internet*,
Report and Order on Remand, Declaratory Ruling, and Order,
30 FCC Rcd. 5601 (2015)....................................................................................23

*Rates for Interstate Inmate Calling Services*,
Report and Order and Further Notice of Proposed Rulemaking,
28 FCC Rcd. 14107 (2013)..................................................................................20

*Regulation of International Accounting Rates*,
First Report and Order, 7 FCC Rcd. 559 (1991) ................................................10

*Regulatory Policies Concerning Resale and Shared Use of
Common Carrier Services and Facilities*, Report and Order,
60 F.C.C.2d 261 (1976) ..................................................................................9, 23

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

## Other Authorities

Restatement (Third) of Foreign Relations Law § 402 (1987) .................................13

## INTRODUCTION

Both the Commission and Digicel claim that Digicel is not subject to the Communications Act because, in its role as a foreign carrier, it terminates calls in Haiti. But what Digicel does in Haiti is irrelevant. Digicel ***also*** sells calls from the United States to Haiti. It is subject to the Act with respect to ***that*** activity, *FTC v. AT&T Mobility*, 883 F.3d 848 (9th Cir. 2018), which is the sole focus of UPM's complaint.

On the merits, the Commission ignored fifty years of its own precedent and detailed evidence from UPM's expert economist showing that Digicel cutting off UPM's services was unjust, unreasonable, and unreasonably discriminatory, in violation of Sections 201(b) and 202(a).[1] Resale restrictions generally are unreasonable, and here Digicel's price-discrimination scheme harmed both consumers and the market for calls to Haiti.

The petition for review accordingly should be granted.

## ARGUMENT

### I. Digicel Is A Carrier Subject To The Act.

UPM demonstrated in its opening brief (at 22-24) that Digicel is a "telecommunications carrier" for purposes of the Act—and thus subject to the

---

[1] 47 U.S.C. §§ 201, 202. References to "Section" are to sections of 47 U.S.C., and references to "the Act" are to the Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.*

obligations placed on carriers by Sections 201 and 202.

Digicel sells U.S.-to-Haiti calls. The Act "appl[ies] to all … foreign communication by wire or radio … which originates … within the United States."[2] So the Act plainly applies to those calls. "Telecommunications" is "the transmission [of information] between or among points specified by the user."[3] Again, no question that these calls qualify. "Telecommunications service" means "the offering of telecommunications for a fee directly to the public, … regardless of the facilities used."[4] Digicel offered just that (by arranging for its SIM card holders to be able to roam on AT&T and T-Mobile's U.S. networks, and by selling the Roam-Like-You're-Home (RLYH) program to its SIM card holders in the United States). Finally, a "telecommunications carrier" is "any provider of telecommunications services"—check—who as a result of that status will "be treated as a common carrier … to the extent that it is engaged in providing telecommunications services."[5] The Act thus commands the Commission to "treat[]" Digicel as a common carrier for purposes of Section 201 and 202. Its failure to do so is reversable error.

---

[2] 47 U.S.C. § 152.

[3] *Id.* § 153(50).

[4] *Id.* § 153(53). The Act "do[es] not distinguish facilities-based and non-facilities-based carriers." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Svcs.*, 545 U.S. 967, 997 (2005).

[5] 47 U.S.C. § 153(51).

2

In response, the Commission essentially ignores these governing statutory provisions: In its own words, it "***never considered*** whether Digicel Haiti's facilities (or lack thereof) placed Digicel Haiti within (or outside) the 'telecommunications carrier' definition" in the Act. FCC Br. 30 (emphasis added). This admission alone arguably necessitates vacatur. Agency action is arbitrary and capricious when the agency has not "reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). But even setting this admission aside, the Commission's defense of its denial of jurisdiction lacks merit.

### A.    Digicel is subject to the Act under Section 152.

The FCC's primary argument (FCC Br. 24-28) is that Digicel is not subject to Sections 201 and 202 because its service is not within the purview of Section 152(a). That argument is doubly wrong: It ignores the statutory text, which creates jurisdiction over foreign communications originating in the United States, not just over persons engaged within the United States in such communications. And it is inconsistent with the facts here, which demonstrate that Digicel was in fact "engaged within the United States in such communication."

3

Section 152 provides that the Act:

> shall apply to all interstate and foreign communication by wire or radio … which originates … within the United States, ***and*** to all persons engaged within the United States in such communication ….

47 U.S.C. § 152(a) (emphasis added).

United States-to-Haiti calls are "foreign communication[s]," so the first phrase means that the Act applies to Digicel's service—and that Digicel therefore must comply with the Act. The agency entirely ignores that phrase, however, focusing on the second and treating it as a limitation—and a facilities-based limitation at that.[6] But the statute says that it covers ***both*** "interstate and foreign communication" ***and also*** entities "engaged within the United States" in providing "such communication." The conjunction "and" means that the second phrase ***expands*** the agency's authority. Furthermore, the facts UPM presented show that Digicel was "engaged within the United States" in providing communications under the second phrase of Section 152(a).

### 1. U.S.-to-Haiti roaming calls are "foreign communication by wire or radio … which originate[] … within the United States," and subject to Section 152.

Relying on *FTC v. Verity International, Ltd.*, 443 F.3d 48 (2d Cir. 2006), the

---

[6] *See* FCC Br. 16 (the Act "only provides … regulatory authority over U.S. carriers that offer domestic service and carriers that transport calls between the United States and a foreign country"); *id.* at 20-21 (same); *see also* Digicel Br. 9 ("to be subject to the FCC's authority, [Digicel] ***must be*** 'engaged within the United States'" in providing service) (emphasis added; other emphasis omitted).

agency argues that Digicel is not subject to the Act because the phrase "'engaged within the United States' places a statutory 'limitation' on the Commission's authority," and all of Digicel's activities regarding the calls at issue "occurred solely in Haiti." FCC Br. 24-25 (quoting *Verity*, 443 F.3d at 59). According to the Commission, the Second Circuit held that "foreign carriers that terminate calls outside the United States … 'are not carriers subject to the Communications Act.'" FCC Br. 25 (quoting *Verity*, 443 F.3d at 59); *see also* Digicel Br. 12. Foreign carriers are, the agency thus argues, immune from the requirements of the Act—no matter what they might do in the United States—because of their status as foreign carriers.

This argument is unsupported and unsupportable. For starters, it isn't what the Second Circuit held. What that court ***actually*** said is that if ***all*** an entity does is terminate calls outside the United States, that entity is not subject to the Act. *See Verity*, 443 F.3d at 59 (characterizing the entity "as a ***purely*** foreign terminating carrier") (emphasis added). It noted that "none" of the entity's activities "gave it the status of a common carrier subject to" the Act. *Id.* at 60.

But even if the agency were right that the Second Circuit had endorsed an all-or-nothing approach to carrier status, that is not the law in this Circuit. In a series of cases—most recently *FTC v. AT&T Mobility LLC*—this Court has stressed that "a company may be an interstate common carrier 'in some instances but not in others, depending on the nature of the activity which is subject to scrutiny.'" 883 F.3d at

860 (quoting *McDonnell Douglas Corp. v. Gen. Tel. Co. of Cal.*, 594 F.2d 720, 724-25 n.3 (9th Cir. 1979)). In other words, the fact that Digicel is a terminating foreign carrier does not bar jurisdiction over Digicel with respect to Digicel's other activities.

No one disputes that a "purely foreign terminating carrier" is outside the FCC's jurisdiction. *See Verity*, 443 F.3d at 59-60. But the agency has jurisdiction over any calls "originat[ing] … within the United States" that a foreign carrier terminates, and over any entity involved in those calls within the United States—which can be the foreign carrier itself. The mere fact that Digicel is a terminating foreign carrier does not exempt it from the Act when it has taken actions within the United States with respect to those calls—which it has.

### 2. Digicel's is "engaged within the United States" in foreign communication.

Turning to the other prong of Section 152(a), the FCC's argument that Digicel was not "engaged within the United States" in communications is unsupportable. The record shows that Digicel sold—and offered in the United States—wireless calls in the United States using its SIM cards, including calls from the United States to Haiti (regardless of what carrier terminated those calls in Haiti).[7] This means that Digicel was "engaged within the United States" in foreign communications under

---

[7] *Joint Statement* ¶ 15, 2-ER-97 (under RLYH, all "roaming calls from the United States" were charged at $0.09 per minute).

Section 152(a). Consider the following:

- Digicel entered into contracts with United States entities—AT&T and T-Mobile—to ensure that its SIM card holders could make calls in the United States, including from the United States to Haiti.[8]

- Digicel made explicit offers of its RLYH service to SIM card holders that it knew were in the United States.[9]

- Digicel itself, not its roaming partners, billed its SIM card holders for the roaming calls they made in the United States.[10]

- Digicel accepted payment for its services from within the United States.[11]

Whatever minimum level of United-States-linked activity might be necessary to be "engaged within the United States," these actions surely exceed that minimum.

Trying to downplay Digicel's United States activity, the agency focuses on the fact that "[p]urchasers bought a Digicel Haiti SIM card to use Digicel Haiti's prepaid wireless service" in Haiti, FCC Br. 37, which the FCC construes as including

---

[8] *See generally Order ¶¶* 6-7, 1-ER-19–21; *see also Sprint Corp. v. FCC*, 151 F.4th 347, 364 (D.C. Cir. 2025) ("whenever a [wireless] device connects to the network"—even if the end user is not making a call—"the carrier is making telecommunications available" under the Act).

[9] *Joint Statement ¶* 16, 2-ER-97–98. In calling RLYH a "pricing plan" rather than a "service," FCC Br. 38, the agency ignores that it is a pricing plan *for* foreign communication—a telecommunications service. The parties before the agency, *e.g.*, *Joint Statement ¶¶* 15-16, 21, 2-ER-97–98, as well as the district court, *e.g.*, Opinion and Order, *Unigestion Holdings, S.A. v. UPM Tech., Inc.*, No. 3:15-CV-00185-SI (D. Or. Jan. 18, 2022) (*Summary Judgment Ruling*), 2-ER-255–256, referred to RLYH as a "service."

[10] *Reconsideration ¶¶* 2-3, 1-ER-3.

[11] *Order ¶* 11 n.48, 1-ER-23 (payment made to third party who paid Digicel).

calls from the United States to Haiti. But the phones using those SIM cards could only make such calls because Digicel had sought out and entered into contracts with AT&T and T-Mobile to allow roaming on their U.S. networks (that is, to allow Digicel to resell those carriers' services). The fact that Digicel also did things in Haiti—selling SIM cards to distributors, terminating calls, etc.—is irrelevant.[12]

The FCC also errs by importing a facilities requirement into "engaged within the United States." FCC Br. 16, 20-21 (entity must "transport calls"); *see* Digicel Br. 8. The natural reading of that phrase is that an entity is "engaged within the United States in" interstate or foreign communication if it is involved in the business of providing such communication. That is, Section 152(a) covers interstate and foreign communications as services, and also anyone involved in providing that service—whether facilities-based or not.

This more natural reading is supported by the parallel language in Section 153(11). That provision defines "common carrier" as "any person engaged as a common carrier for hire, in interstate or foreign communication." The agency has

---

[12] Even on its own terms, the FCC's focus is misplaced: Direct purchasers of Digicel's SIM cards were third-party distributors, *Joint Statement* ¶ 6, 2-ER-95, who obviously did not intend to use Digicel's service. By selling to distributors, Digicel was putting SIM cards—small, physical items, not services—into the stream of commerce. To actually obtain *service* from Digicel, a SIM card holder had to put the card into a wireless device, make payments to the account, and then actually make a call—all of which could, and did, happen in the United States.

held that entities reselling interstate service are common carriers "engaged in interstate communication."[13] Entities reselling international service are, therefore, "engaged in foreign communication."

Section 153(51), which requires the agency to regulate an entity "to the extent that it is engaged in providing telecommunications services," also supports this reading. Under this provision, pure resellers are carriers. *Brand X*, 545 U.S. at 997. Resellers, therefore, are "engaged in" providing the services they sell.

There is no reason to construe "engaged in" to contain a facilities requirement in Section 152(a) when there is no such requirement in the parallel language in Sections 153(11) or 153(51). To the contrary, courts look to the overall text and structure of the Act to understand what specific provisions mean. *See China Unicom (Ams.) Operations Ltd. v. FCC*, 124 F.4th 1128, 1145, 1147, 1150 (9th Cir. 2024). Sections 153(50), (51), and (53) require the agency to regulate non-facilities-based carriers. As with the agency's authority to revoke Section 214 authorizations at issue in *China Unicom*, here "there is no suggestion in the text of the Communications Act that Congress intentionally withheld" regulatory authority over international resellers while "expressly granting it with respect to" domestic resellers. 124 F.4th

---

[13] *Regulatory Policies Concerning Resale and Shared Use of Common Carrier* Services *and Facilities,* Report and Order, 60 F.C.C.2d 261, ¶ 101 (1976) (*Resale Order*) (subsequent history omitted). Neither the FCC nor Digicel even cite to this seminal precedent (discussed at UPM Br. 5, 8, 19, 25, 32, 43-44).

at 1147. Different provisions in the same statute should be interpreted in harmony. *Shirk v. United States*, 773 F.3d 999, 1004 (9th Cir. 2014). The agency's reading of Section 152(a) should be rejected because it creates discord.

Creating a facilities requirement for international calling, moreover, would mean that the agency lacks authority over international resellers, which would contradict decades of precedent. The agency addressed international resale in detail as early as 1991,[14] and considered it in depth again in 2004.[15] It even has a rule entitled "Resale-based international common carriers" dedicated to regulating international resellers,[16] and nothing in that rule suggests that international resellers must have facilities. Other rules not only recognize international resellers but also expressly contemplate that foreign carriers—such as Digicel—can themselves be under the agency's authority.[17]

The FCC's misreading of Section 152(a), however, goes even further. The second phrase of the statute, on which the agency relies, makes no distinction

---

[14] *Regulation of International Accounting Rates*, First Report and Order, 7 FCC Rcd. 559, ¶ 8 (1991) ("the extension of unlimited resale into the international telecommunications market would yield the same public benefits in that market" as "in the U.S. domestic telecommunications market").

[15] *See International Settlements Policy Reform; International Settlement Rates*, First Report and Order, 19 FCC Rcd. 5709, ¶¶ 3-5, 11, 14, 18-20, 25, 29, 35 (2004).

[16] *See* 47 C.F.R. § 63.23.

[17] Both 47 C.F.R. § 63.10(a)(2) and (a)(3) refer to "a U.S. carrier that is … a foreign carrier."

between interstate communication and foreign communication, referring to both together as "such communication." The agency, however, would treat domestic resellers with no facilities as "engaged within the United States" in interstate communication, but treat international resellers with no facilities as immune from the Act. But both types of service are embraced by "such communication," so there is no textual basis for treating them differently.

The agency's reading of Section 152(a), in short, is completely wrong, creating "a sclerotic view of the agency's authority … affirmatively inconsistent with the statute's declared purpose." *China Unicom*, 124 F.4th at 1150. It treats an expansion of jurisdiction as a limitation; it contradicts agency precedent; it directly conflicts with other provisions of the Act; it imposes a facilities requirement only on foreign communications when the text compels treating interstate and foreign communications the same; and it ignores regulatory orders and rules that expressly recognize that non-facilities-based resellers of international service are subject to the Act.

**B.    Regulating Digicel is not an extraterritorial application of the Act.**

The agency argues that finding Digicel to be subject to the Act would be an impermissible "extraterritorial" application of the Act. FCC Br. 27-28 (quoting *Kiobel v. Royal Dutch Petroleum Co*., 569 U.S. 108, 115 (2013)). This argument is without merit.

Digicel entered into contracts with United States entities—T-Mobile and AT&T—to provide services from within the United States. It offered, via text messages sent to the United States, to provide those services to SIM card holders within the United States. And SIM card holders could and did accept those offers and pay for those services from within the United States.[18] Applying the Act to Digicel is not "extraterritorial" at all.

This conclusion does not change because Digicel took the ministerial step of de-authorizing UPM's SIM cards from outside the United States, or because Digicel was *also* the terminating carrier on UPM's customers' calls from the United States to Haiti. *See* FCC Br. 2, 11, 21, 24, 26.[19] It would not be "extraterritorial" to sanction a foreign manufacturer for violating auto emissions standards for cars sold in the United States if the defective manufacturing happened overseas. If foreign manufacturers want to sell cars here, requiring compliance with our standards is not extraterritorial even though the manufacturers must take steps overseas to do so. Requiring Digicel to abide by United States law with respect to the services it sells here is not extraterritorial either.

Moreover, there is nothing extraterritorial in holding Digicel accountable for

---

[18] *Joint Statement* ¶ 16, 2-ER-97–98.

[19] Some of Digicel's customers' roaming calls presumably were entirely domestic, and others may have terminated in other countries worldwide.

cutting off UPM's United States services, even if those actions occurred in Haiti. It took affirmative actions that were intended to and did have their effects here. It is literally hornbook international law that a country may exercise jurisdiction over a foreign entity for acts taken overseas that were intended to and did create harm in the country asserting jurisdiction.[20]

*Cable & Wireless PLC v. FCC*, 166 F.3d 1224 (D.C. Cir. 1999), on which both the agency and Digicel rely,[21] does not support their view. There, foreign carriers argued that banning United States carriers from paying more than the benchmark rates was tantamount to regulating foreign carriers directly.[22] But the D.C. Circuit held that this was simply regulating United States carriers in their provision of foreign communications, even though that regulation had effects overseas.[23] Digicel is a United States carrier **with respect to its services here**, so requiring Digicel to abide by the Act in providing those services is simply regulation of a United States carrier in a way that might have effects overseas.

The argument based on *Cable & Wireless*, at bottom, reflects a status-based approach to carrier status: Digicel is supposedly exempt from regulation because it

---

[20] Restatement (Third) of Foreign Relations Law § 402 (1987).

[21] FCC Br. 26; Digicel Br. 12.

[22] *See* 166 F.3d at 1228-29.

[23] *Id.* at 1230.

is a foreign carrier. But it is **_also_** a United States carrier, with respect to its sale of calls in the United States (to Haiti or elsewhere). *Cable & Wireless* thus supports UPM; it confirms that the agency can regulate Digicel in its role as a United States carrier, even if that regulation has effects overseas.

### C.  International comity does not exempt Digicel from regulation.

The agency also suggests that even if it has the power to regulate Digicel, it should not do so. First, it suggests that if it did, it would have to regulate all foreign wireless carriers that offer roaming here. FCC Br. 28; *see* Digicel Br. 14-15. Second, it suggests that foreign nations could retaliate by regulating United States carriers offering back-to-the-United-States roaming services. FCC Br. 28; *see* Digicel Br. 14-15.

The first concern is overstated. If a foreign carrier abuses customers in the United States when selling calls that originate here, there is no reason the agency should not protect those customers. Moreover, there is nothing novel about regulating foreign carriers that sell services here. As noted above, the agency's rules expressly refer to "a U.S. carrier that *is* … a foreign carrier."[24] These rules have been in effect for decades,[25] which undercuts any claim that it would be problematic to

---

[24] *See* 47 C.F.R. § 63.10(a)(2), (3) (emphasis added).

[25] *See Market Entry and Regulation of Foreign-affiliated Entities*, Report and Order, 11 FCC Rcd. 3873, ¶¶ 246, 250 & App'x B (1995).

assert jurisdiction over foreign carriers operating as resellers in the United States. And to the extent foreign carriers need Section 214 certificates to resell U.S. services via roaming, *see* FCC Br. 27, the agency has ***already*** granted blanket Section 214 authority with respect to interstate service to them and all other carriers.[26] It could do the same for foreign service as well.[27]

The second concern is also unwarranted. If a United States carrier engaged in abusive conduct with respect to customers roaming overseas, there is no reason foreign countries should not address that abuse within their own borders.[28] Beyond that, by focusing its specific regulations on dominant foreign carriers, the FCC would minimize any risk of "tit for tat" regulation—as no wireless carrier is dominant in this country.

---

[26] *See Implementation of Section 402(b)(2)(A) of the Telecommunications Act of 1996*, 14 FCC Rcd. 11364 (1999), ¶¶ 7, 12 (47 C.F.R. § 63.01(a) grants "blanket authority" under Section 214 to "promote competition by deregulating domestic entry").

[27] The rules also already distinguish between international resellers that are home-country monopolists and those that are not. *See* 47 C.F.R. § 63.10(a)(3) (home-market market share less than 50% required for non-dominant status); § 63.10(c), (d) (special obligations for dominant carriers). The FCC could impose differential obligations on foreign dominant carriers in granting Section 214 authority.

[28] As noted in UPM's opening brief (at 56), the FCC has held that procompetitive United States policies—such as, here, the ban on resale restrictions—take precedence over anticompetitive policies of other nations. Given this, the agency's purported concern about how other nations might react to enforcing procompetitive rules against Digicel rings hollow.

### D. Roaming is resale.

The agency continues to argue that when Digicel bought service from another carrier and then sold that same service to its own customers, it was not "resale," and to defend this claim on the ground that the arrangement between Digicel and the underlying carriers was called "roaming." FCC Br. 30-35; *see also* Digicel Br. 4-7. Nonsense. *See* UPM Br. 28-32.

The agency concedes that the *Parts 1 and 63 Order* held that, for purposes of the reach of the Act, roaming is a form of resale.[29] But now it says that it made that ruling because the distinction "does not matter" in the context of that order. FCC Br. 33-34; *see* Digicel Br. 13-14. Its apparent theory is that it had authority over U.S. wireless carriers anyway, FCC Br. 32-34, so its jurisdiction was not really in question, and thus—despite what it said—roaming is not really resale.

This argument is inconsistent with the *Parts 1 and 63 Order.* The issue there was whether the Act covered back-to-home-country roaming. If it did, then wireless carriers offering that service needed additional authorization. There was no dispute that resale was covered by the Act—it is. So the carriers—to avoid those additional authorizations—argued that roaming was not resale. That is the argument the agency rejected, holding that while roaming and resale may mean different things in some

---

[29] *Amendment of Parts 1 and 63 of the Commission's Rules*, Report and Order, 22 FCC Rcd. 11398, ¶ 21 (2007) (*Parts 1 and 63 Order*) (subsequent history omitted).

contexts, when the question is whether roaming entails reselling telecommunications—that is, whether it falls under the agency's authority—the answer was that it did.[30] The fact that the agency *already* regulated the carriers in other contexts was irrelevant and, indeed, played no part in the agency's reasoning.[31]

The agency resists this interpretation of the *Parts 1 and 63 Order* because it has not previously addressed whether its authority reaches services like Digicel's, nor affirmatively required foreign carriers selling back-to-home-country roaming services to obtain Section 214 authorizations. *See* FCC Br. 34-35. But that failure is not a valid basis for distinguishing the situations. The fact that this case may present new issues does not mean the agency may ignore its precedents, let alone the Act.[32] The agency has never had to address the specific issue in this case because, unlike Digicel, other foreign wireless carriers do not have home-country monopolies that would enable them to engage in the type of anticompetitive conduct that Digicel has engaged in here.[33]

---

[30] *Id.*

[31] *Id.* ¶¶ 17-22.

[32] *See* page 15, *supra* (addressing Section 214 authorizations).

[33] In a final effort to avoid acknowledging that roaming is resale, the agency again claims that Digicel cannot be "engaged within the United States" in foreign communication "based solely on its roaming arrangement with a U.S. carrier." FCC Br. 34-35. But as discussed above (at 8-10), that argument rests on the untenable notion that only entities with facilities can be "engaged within the United States" in providing telecommunications here.

17

Finally, nothing about UPM's argument makes roaming "de facto mandatory resale." *See* FCC Br. 32 (cleaned up). The rulings to which the agency refers address the now-expired obligation of a facilities-based wireless carrier to resell its services to a competing facilities-based wireless carrier licensed in the same area, in order to help the latter enter the market. As UPM explained, that former rule has no bearing on this case because neither UPM nor Digicel is a facilities-based wireless carrier.[34]

## II.    Cutting Off UPM's Service Violated Sections 201(b) And 202(a).

Once Digicel's status as a regulated carrier is established, it is clear that the agency's denial of UPM's claims under Sections 201(b) and 202(a) is unsupportable.

Confronted with UPM's demonstration that Digicel was implementing an anticompetitive price-discrimination scheme, the agency claims that: (a) UPM failed to show ill effects in the marketplace arising from Digicel's actions, FCC Br. 49-50; (b) there is no formal presumption against resale restrictions for wireless services, *id*. at 41-45; *see also* Digicel Br. 22-23; (c) UPM's resale inconvenienced Digicel in its relations with its roaming partners, FCC Br. 46-47; *see also* Digicel Br. 19-21; and (d) UPM's conduct justifies rejecting its claims. FCC Br. 45-46; *see also* Digicel Br. 16-20. None of these arguments has merit.

---

[34] UPM Br. 47-50.

**A.** **UPM demonstrated that Digicel's price discrimination harmed consumers and the telecommunications market.**

The agency argues UPM "failed to establish" that Digicel's price discrimination harmed consumers, or that UPM's resale activity had procompetitive effects. FCC Br. 49-50; *see also* Digicel Br. 20-21; *Order* ¶ 32, 1-ER-34. This argument is ridiculous. The agency simply ignored UPM's evidence and authorities.

It is uncontested that Digicel has a 70% market share in its home market,[35] which gives it market power. It is uncontested that Digicel charges $0.23 to some customers and $0.09 to others,[36] i.e., that it is engaging in price discrimination. It is uncontested that UPM was attacking that price discrimination by buying service at the $0.09 per minute rate and reselling it to customers who would otherwise have to pay $0.23.[37] And it is uncontested that the reason Digicel cut off UPM's services was because it observed that UPM was reselling them.[38]

UPM explained to the FCC how, given these facts, UPM's resale of Digicel's

---

[35] 2-ER-202 ¶ 18 (*UPM Complaint*) (alleging 70% market share); 2-ER-180 (*Digicel Answer*) (admitting market share).

[36] 2-ER-209 ¶ 38 (*UPM Complaint*) (UPM buys service at $0.09 rate and undercuts Digicel's $0.23 rate); 2-ER-185 (*Digicel Answer*) (admitting facts in complaint).

[37] Expert Disclosure of Joseph Gillan, ¶¶ 46-47, 2-ER-124–125 (*Gillan Declaration*) (describing UPM's resale).

[38] *Joint Statement* ¶ 18, 2-ER-98. Digicel suggests that UPM was not really a "reseller" because it did not negotiate a special resale contract with Digicel. Digicel Br. 18, 23. But UPM did not need such a contract; Digicel's RLYH offering was resell-able "as is." *See* UPM Br. 42-43 n.136.

services undermined Digicel's anticompetitive price-discrimination scheme. UPM cited numerous FCC precedents explaining why resale restrictions harm consumers and why resale helps them.[39] And UPM provided the FCC with the detailed declaration of an expert economist, Joseph Gillan,[40] who explained in specific detail not only the general economic benefits of resale (and harms from resale restrictions), but also why UPM's continued resale of Digicel's services in particular would have produced those benefits:

- Pricing telecommunications services above cost harms consumers and distorts the market; this is why the agency has consistently pursued policies that pressure carriers to move prices toward cost.[41]

- Carriers with market power—like Digicel—exercise that power through price discrimination, charging some customers higher prices, and other customers lower prices, for the same service.[42]

- Resale undercuts this abuse of market power by making the lower, more

---

[39] *See UPM Complaint* ¶¶ 4 n.7, 10, 60, 65, 67, 70-73, 2-ER-196, 2-ER-198, 2-ER-220, 2-ER-222–225; *UPM Reply*, 4-ER-464–466.

[40] 2-ER-106–130.

[41] *Gillan Declaration* ¶¶ 17-19, 2-ER-114–115. Pushing rates towards cost is central to the agency's obligation under Section 201(b) to ensure rates are "just and reasonable." *See Rates for Interstate Inmate Calling Services*, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107, ¶ 45 (2013) (requirement to establish cost-based rates); *MCI Telecomms. Corp. v. FCC*, 675 F.2d 408, 410 (D.C. Cir. 1982) (to "ensure that rates are 'just and reasonable,'" rates should be "determined on the basis of cost"). Both the agency and Digicel argue that Digicel's conduct should be excused because UPM did not show that Digicel had "harmed the communications marketplace in the United States." FCC Br. 17, 49-50; *see* Digicel Br. 20-21. But that simply ignores that above-cost rates harm consumers.

[42] *Gillan Declaration* ¶¶ 10(b), 14, 19, 23-24, 41, 44, 2-ER-112–117, 2-ER-122–123.

> cost-based price available to customers who would otherwise have to pay the higher price.[43]

- UPM's resale of Digicel's RLYH service would produce these beneficial effects.[44]

In stark contrast, Digicel presented nothing on these points—and still the agency ignored UPM's evidence. Indeed, the agency's orders do not even acknowledge that Mr. Gillan's declaration exists, much less show that his analysis is wrong.

The agency notes (FCC Br. 50) that the upper end of Digicel's price-discrimination scheme—the $0.23-per-minute rate charged to carriers—was not itself unlawful. This is true, but irrelevant. Neither the agency's precedents nor economic logic suggest that the high end of a price-discrimination scheme must be unlawful. To the contrary, both the high and low rates in many prior price-discrimination schemes were set out in approved carrier tariffs. The point of banning resale restrictions is to get the price discriminator to lower its above-cost rates in response to market forces, without direct regulation.[45] UPM's resale of Digicel's

---

[43] *Gillan Declaration* ¶¶ 14, 23, 2-ER-113–114, 2-ER-116. This "arbitrage" is how resale defeats price discrimination. *See UPM Reply*, 4-ER-465 & n.115 (citing Mr. Gillan's declaration explaining how resale promotes beneficial price competition— "resellers make it happen"). The FCC and Digicel suggest that there is something nefarious about arbitrage, *see* FCC Br. 41, 50; Digicel Br. 17, 20-21, but in fact it should be celebrated. *See* UPM Br. 44-45.

[44] *Gillan Declaration* ¶¶ 45-50, 2-ER-124–127.

[45] *See 1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements*, Report and Order and Order on

services provided precisely the type of market-based pressure that the FCC has regularly endorsed.

### B. No formal presumption is needed to conclude that Digicel violated the Act.

The agency argues at length that there is no formal, "blanket" presumption against resale restrictions. FCC Br. 41-45. But that is not UPM's argument. Rather, such restrictions are *generally* unlawful because they facilitate monopoly abuse, *see* UPM Br. 43-47, and the few situations where resale restrictions have been permitted have involved specific countervailing concerns, *id*. at 47-51. UPM demonstrated (at 52) that the general ban on resale restrictions should apply here because Digicel is a carrier with market power engaging in an anticompetitive price-discrimination scheme, which UPM's resale would have helped to defeat.

The agency notes that the definition of "resale" from the 1996 *Wireless Resale Order*[46] refers to resellers as entities that buy service directly from a facilities-based provider, FCC Br. 44, and suggests that this means only facilities-based providers— and thus not Digicel or other resellers—have an obligation not to discriminate against resellers, *id.* at 45. There is no support for this argument. That ruling

---

Reconsideration, 14 FCC Rcd. 7963, ¶¶ 1, 63 n.119 (1999) (agency expressly noting it was relying on competition and technological change—not direct regulation—to lower call-termination rates below benchmark levels).

[46] *Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services*, 11 FCC Rcd 18455 (1996).

addressed resale of services of facilities-based wireless carriers, and did not mention resale by other carriers. The *Resale Order* itself said that it violated the Act for carriers to deny service to resellers.[47] It also held that "an entity engaged in [resale] is a common carrier … fully subject to the provisions of" the Act"[48]—which would include the ban on resale restrictions that it had just articulated. The agency has repeated this point as recently as 2015.[49] And, in any event, the Act "do[es] not distinguish facilities-based and non-facilities-based carriers." *Brand X*, 545 U.S. at 997. Exempting resellers—carriers themselves—from the ban on resale restrictions would be making exactly that distinction.

The agency was obliged either to follow its precedents or to provide a cogent explanation of why it declined to do so. It is paradigmatic arbitrary and capricious decision-making to deny UPM's complaint when the reasoning underlying fifty years of precedent condemning resale restrictions fully applies here.

### C. UPM's resale inconvenienced Digicel with its roaming partners because it was working.

Both the agency and Digicel argue that Digicel was justified in cutting off

---

[47] *Resale Order* at ¶¶ 45, 130.

[48] *Id.* ¶ 8.

[49] *Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601, ¶ 188 n.458 (2015) (citing the *Resale Order* and holding that resellers of newly defined common carrier services are themselves carriers) (subsequent history omitted).

UPM's services due to the difficulties UPM's resale caused Digicel in its dealings with its roaming partners. FCC Br. 46-47; Digicel Br. 19-21. The problem with this argument is that the difficulties Digicel encountered are precisely what was needed to pressure Digicel to lower its above-cost call termination rates.

The materials UPM filed under seal explain this in more detail.[50] At a high level, however, when UPM began reselling call termination to Haiti, it charged its customers less than the $0.23 rate they would otherwise have paid Digicel. But UPM was physically using the services of Digicel's host carriers, and those host carriers still had to get the calls back to Haiti—and when they did, they paid the $0.23 rate.

These carriers knew full well that Digicel's underlying cost of call termination was close to zero.[51] So, it is hardly surprising that when the volume of roaming calls bound for Haiti—which cost the host carriers $0.23 per minute—increased after the introduction of the RLYH plan (at least in part due to UPM's resale), Digicel's host carriers would object and try to negotiate a better deal. And the net effect of the new negotiated terms was a price decrease.[52]

In other words, UPM's resale helped push Digicel's call-termination rates

---

[50] *See UPM Reply*, 4-ER-467–472 (discussing revisions to Digicel's roaming agreements).

[51] *Connect America Fund*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663, ¶ 753 (2011) (*Connect America Fund*) ("the incremental cost of call termination is very nearly zero").

[52] UPM Br. 56-57; 4-ER-467–472.

down closer to cost. The fact that it was Digicel's roaming partners who put the direct pressure on Digicel is not only unsurprising, it is exactly what one would expect: It was the roaming partners who had to pay the higher rate.[53]

Digicel's difficulties with its roaming partners are not a problem that justifies letting Digicel ban UPM's resale. They show that UPM's resale was doing exactly what the Commission hopes resale will do.

### D. UPM's actions did not justify cutting off its services.

The agency tries to justify Digicel's conduct by pointing a finger at UPM, *see* FCC Br. 45-46, claiming that UPM "sought at every turn to conceal from Digicel Haiti the identity of both itself and the callers," *id.* at 3, 17, 21, 45. This is a gross mischaracterization of the undisputed facts.[54] Regardless, nothing UPM supposedly did—even under the agency's mischaracterization—justifies giving Digicel a free pass.

*First*, the uncontested record shows that there was no requirement or, indeed, opportunity, for UPM to identify itself to Digicel:

- Digicel sold SIM cards to distributors, who sold them on the street without

---

[53] *See Gillan Declaration* ¶ 49, 2-ER-126 (UPM's resale would put "indirect" pressure on Digicel's above-cost rates through roaming arrangements).

[54] The agency claims that it did not rely on the jury verdict in condemning UPM's conduct, *see* FCC Br. 47-49, but its reliance on the supposedly "fraudulent" nature of UPM's activities is pervasive. *See Order* ¶¶ 30, 33, 36 & n.145, 1-ER-32–33, 1-ER-35–37; *Reconsideration* ¶¶ 20-22 & nn.96 & 98, 1-ER-13–15. This was improper. *See* UPM Br. 53-55.

obtaining information about who was buying them.[55]

- Digicel permitted SIM card holders to add money to a SIM card account by means of third-party websites that required no identification.[56]

- Authenticating a SIM card and making calls was an entirely electronic, scripted process with no opportunity to communicate anything, much less to communicate identification information.[57]

If UPM had evaded any actual identification requirement, Digicel would have pointed that out. It has not, because Digicel did not care who its customers were; it just wanted their money. Its complaints about UPM are all about protecting its illegitimate price-discrimination scheme.

*Second*, the FCC and Digicel argue that UPM nefariously obscured or manipulated the telephone number of the party making the calls that UPM connected to Digicel's service.[58] This is false, and in any event no basis for rejecting UPM's claims.

The agency acknowledges that the telephone number associated with a call

---

[55] 2-ER-80 (Transcript of Trial at 123:4-13) (*Trial Transcript*); *Summary Judgment Ruling*, 2-ER-256, 2-ER-266–267 & n.17; *Boute Deposition* at 36:23-37:6, 3-ER-370–371. The agency notes that UPM used third-party contractors to purchase SIM cards in Haiti. FCC Br. 2, 9, 15. But UPM, as a corporation, necessarily had to use agents to physically buy the SIMs.

[56] *Order* ¶ 11 n.48, 1-ER-23.

[57] *Joint Statement ¶* 16, 2-ER-97–98; *Summary Judgment Ruling*, 2-ER-256, 2-ER-265–268 (UPM made no material misstatements or material omissions to Digicel).

[58] *See* FCC Br. 2, 10, 48-49; Digicel Br. 18-19.

comes from the SIM card used to authenticate the call.[59] The district court specifically found that UPM did nothing to manipulate or hide any telephone numbers.[60] What UPM "transmitted" was authentication information from its SIM cards; Digicel associated the phone numbers that Digicel had assigned to those SIM cards with the calls UPM made using those cards.[61] UPM didn't manipulate anything—it correctly sent the SIM card information along with the calls it made.

But even accepting the premise that UPM should have sent along the numbers of its customers—whose calls were connected to the AT&T and T-Mobile services using the Digicel SIMs that UPM purchased—FCC precedent demonstrates that the failure to do so provides no basis for Digicel to cut off UPM's service. In 2011, the FCC amended its rules to require that carriers transmit the originating party's number when sending traffic to an interconnected carrier.[62] Some commenters had urged the agency to permit carriers who believed they were receiving calls without

---

[59] FCC Br. 7 (SIM card "provides the card owner a telephone number"); *id.* at 35 (the subscription associated with a SIM card "includ[es] a telephone number"); *id.* at 48 (UPM "transmitted the telephone number associated with the SIM card").

[60] *Summary Judgment Ruling*, 2-ER-265–268.

[61] *Joint Statement* ¶ 13, 2-ER-96; *Summary Judgment Ruling*, 2-ER-254.

[62] *Connect America Fund* ¶¶ 704, 711 & n.1208 (Commission modifies 47 C.F.R. § 64.1601 to require calling-party number for all voice traffic sent to interconnected carrier). This rule does not apply to resellers—who are treated as customers, not interconnected carriers—so there is no basis for the agency's suggestion (FCC Br. 48 n.11) that UPM violated the rule.

the correct information to cut off connections to the carriers sending those calls. The agency rejected that position: "We decline to adopt any remedy that would condone, let alone expressly permit, call blocking."[63] In other words, when considering the exact situation Digicel claims to have found itself in—getting traffic with the wrong numbers—the agency specifically forbade the receiving carrier from blocking. Yet the agency and Digicel now claim that concerns about inaccurate numbers justified blocking UPM's calls.[64]

Finally, the agency's reliance on *AT&T Corp. v. FCC*, 317 F.3d 227 (D.C. Cir. 2003), *see* FCC Br. 49, is off base. That case involved a "sham entity" trying to force AT&T to pay excessive charges for calls that were being sent via a route specifically designed to generate sham charges. 317 F.3d at 234-35. Because the entity to which the calls were directed was a sham, the agency held that AT&T was not required to complete calls to it. But this has nothing to do with UPM and Digicel. First, UPM was engaged in sending real calls to real people. None of the entities involved—UPM's customers, UPM, Digicel's roaming partners, or Digicel—was any kind of "sham." Second, resale—what UPM was doing—has never been condemned by the agency; until the rulings in this case, resale has been celebrated.

---

[63] *Id.* at ¶ 734 (footnote omitted); *see also id.* ("The Commission has a longstanding prohibition on call blocking.").

[64] FCC Br. 48-49; Digicel Br. 18-19.

And, finally, UPM was not raising anyone's costs or charging anyone excessive rates. To the contrary, by countering Digicel's price-discrimination scheme, UPM was working to lower the rates paid by United States callers for calls to Haiti.

*****

Digicel's termination of UPM's service was "unjust and unreasonable" and "unreasonable discrimination" under Sections 201(b) and 202(a). The FCC's determination to the contrary was arbitrary and capricious.

## CONCLUSION

This Court should grant the petition for review.

Respectfully submitted,

/s/ David M. Gossett
David M. Gossett
Christopher W. Savage
Katherine D. Sheriff
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
chrissavage@dwt.com
katherinesheriff@dwt.com

*Attorneys for Petitioner UPM Technology, Inc.*

Dated: October 27, 2025

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s): 25-227**

I am the attorney or self-represented party.

**This brief contains 6,994 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** _s/ *David M. Gossett*_        **Date:** October 27, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

Dated: October 27, 2025                         s/ *David M. Gossett*